# Exhibit A



Matthew C. Oskowis (pro per)
105 Pony Soldier Road
Sedona, Arizona 86336
(602) 523-1863
Matthew.Oskowis@wellsfargo.com

Friday, July 12, 2013

## ARIZONA DEPARTMENT OF EDUCATION

## OFFICE OF DISPUTE RESOLUTION

```
                              )
                              )
                              )
                              )  DUE PROCESS COMPLAINT
                              )  NOTICE
                              )
                              )
_____)
```

This request is being initiated by the parent of Ethan Oskowis a nine-year old non-verbal autistic currently residing at the above address and attending West Sedona School ("WSS") in the Sedona Oak Creek Unified School District #9 ("District"), Sedona, Arizona.

This Due Process Complaint has no relationship, other than parties involved, with the prior Due Process Complaint **OAH No. 13C-DP-077-ADE** which was resolved per Resolution Agreement on Thursday, June 20, 2013. The prior Due Process Complaint was specifically regarding both Ethan's annual 2010 IEP and 2011 IEP. This Due Process Complaint is specifically regarding Ethan's 2012 IEP and the timeframe of August 2012 up to and including May 2013.

## BACKGROUND

Ethan Corbin Oskowis was diagnosed with classical infantile autism on March 23, 2006, shortly after his second birthday. To this day Ethan is non-verbal and uses augmented communication systems called PECS (Picture Exchange Communication System) to communicate his wants and needs.

Ethan has been a student of West Sedona School in the Sedona Oak Creek Unified School District since March 11, 2010. Ethan had arrived at West Sedona School with an already active IEP from his prior school, Chrysalis Academy of Tempe, Arizona, dated December 11, 2009. The IEP had twenty-one goals & objectives and called out specific methodologies (e.g. PECS, Discrete Trial Training, etc.) that had proven successful with Ethan at Chrysalis Academy.

At the conclusion of the 2009-2010 academic year and after not seeing reasonable progress against Ethan's goals & objectives stated in Ethan's December 2009 IEP, on July 19, 2010 parent requested mediation from Arizona Department of Education between himself and the District. On August 27, 2010 the first of two Mediation meetings was held at the District's offices. On September 27, 2010 the second of two Mediation meetings was held at the District's offices. During the second of two Mediation meetings an agreement was reached between the parent and the District and entered

into record with the Arizona Department of Education under Mediation Reference #11-012.

At the conclusion of the 2010-2011 academic year and again not seeing reasonable progress against Ethan's goals & objectives stated in Ethan's December 2010 IEP, on or about September 26, 2011 the parent again requested mediation from Arizona Department of Education between themselves and the District.

On October 25, 2011 the mediation meeting was held at the District's offices. During the meeting an agreement was reached between the parent and the District and entered into record with the Arizona Department of Education under Mediation Reference #12-15.

Before the October 2011 Mediation meeting District produced Ethan's October 2011 progress report. This report showed Ethan had made substantial progress against all of his goals & objectives, whereas previous progress reports in March 2011 and in May 2011 showed only marginal progress against some of Ethan's goals & objectives.

Included with the October 2011 progress report was a collection of datasheets corresponding with not only the October 2011 progress report but the previous progress reports as well.

After careful analysis of the datasheets provided by the District, certain discrepancies came evident when comparing the actual datasheets of certain goals &

1 objectives to the claims of specific progress by the
2 District in Ethan's October 2011 progress report. But
3 even with the discrepancies, the data sheets showed
4 Ethan had made substantial more progress in nearly two
5 months (September and October, 2011) than he had in the
6 prior fifteen months of academic service provided by
7 the District.

8 In the December 8, 2011 IEP Meeting the IEP Team
9 finalized Ethan's 2011 IEP. Several meetings were
10 utilized in the creation of the IEP with extensive
11 discussion on the specifics of Ethan's goals &
12 objectives and the participation of Ethan's principal
13 evaluator, Andrew Gardner, Ph.D., BCBA-D. The December
14 2011 IEP had seventeen goals & objectives, most of them
15 are the evolution of Ethan's prior goals & objectives
16 from his December 2010 IEP. As the school was able to
17 show Ethan achieving rapid progress in the last few
18 months of 2011 with his December 2010 IEP parent
19 expected the school should be able to continue the
20 momentum since the goals & objectives were not much
21 different from his prior IEP.

22 Towards late January 2012, parent requested to
23 review the data sheets and upon review noticed not only
24 the data sheets had been changed in format, but the
25 datasheets reflected not all the goals & objectives
26 were being worked on. Upon parent inquiry parent was
27 informed, due to the input of an outside consultant,
28 Trina D. Spencer, Ph.D., BCBA, the decision was made

1  certain goals & objectives were going to need to be
2  changed. When parent expressed displeasure in not being
3  informed previously of these changes to Ethan's IEP
4  before they were implemented, District asked parent to
5  meet with Trina D. Spencer to allow her to explain why
6  she had made the changes.

7      Parent was also told by the District he had agreed
8  to bringing on an outside consultant to "*provide*
9  *supervisory and oversight for SOCUSD*" and this is what
10 they had done. In actuality, there had been no formal
11 agreement, although it was expressed as a desire by the
12 parent for the District to employ an outside "expert"
13 during the IEP meetings utilized in the creation of the
14 December 2011 IEP. When the parent had inquired
15 directly whether or not the District would be employing
16 the services of an outside "expert" parent was never
17 given a definitive commitment, and it was not reflected
18 in any documentation. The only mention of an outside
19 "expert" was expressed in the December 2011 IEP in the
20 Parent Notes Section, which parent understood only
21 expresses the desires of the parents and is not
22 considered enforceable by either party.

23     Parent had a meeting with Dr. Trina D. Spencer on
24 February 16, 2012 and parent was explained first of all
25 Dr. Spencer did not understand some of the goals &
26 objectives, thereby she was unsure and/or unable to
27 implement them. As these were goals & objectives had
28 been created by the IEP Team over several meetings the

parent was a bit perplexed why there would be any confusion. Parent also raised the concern of why the parent had to raise the issue regarding the changes first before parent was "brought-in-the-loop" as it were.

The one individual who had been a participant and the major contributor to the goals & objectives of both Ethan's 2010 and 2011 IEP, Shannon J. Lund, a licensed speech-language pathologist, could have easily cleared up any confusion regarding his December 2011 IEP. Unfortunately parent found out the District had apparent difficulty in paying Shannon J. Lund's invoices thereby she was subsequently unavailable to provide the appropriate information. As she was the only person who had been consistent over the recent administration and staff turn-over, parent felt it would be necessary for her to provide the insight into Ethan's education program. Parent's repeated inquiries to the lack of Shannon J. Lund attendance in meetings and trainings was met with indifference.

At the IEP Meeting on February 24, 2012, Dr. Trina D. Spencer expressed she would like to change Ethan's goals from a "visual" to "receptive" based programming. Again parent expressed our concern the District was not working on the IEP as defined in December 2011, but was working on a modified version according to what Trina D. Spencer had defined.

On March 9, 2012 parent received Ethan's March 2012 Progress Report and there were several of his goals & objectives which had the following verbiage *"Instructional programs are developed for this goal but formal instruction and data collection will be implemented consistently in the forthcoming quarter."* This confirmed parent's worst fear; the District was selectively implementing his IEP under the guise since some of these goals & objectives were going to be changed anyway there was no point in working on them. This had been a repeated pattern whereas the District had decided, because there needed to be changes to Ethan's goals & objectives in his IEP, as a reason to not implement the current goals & objectives as-is.

Parent filed a complaint with the Arizona Department of Education, Complaint Reference #2317, on April 4, 2012 and subsequently the ADE found the District was in noncompliance for *"failure to implement the IEP goals in a manner consistent with the Student's December 8, 2011 or the District's own proposal that the goals be implemented in January of 2012 is a clear procedural violation of the IDEA regulations"*[1]. Although the ADE did propose corrective action in the form of in-service training, the ADE did not specifically answer to the question of whether or not FAPE had been denied.

---

[1] Arizona Department of Education Letter of Findings - Reference Number 2317, p. 7

Due Process Complaint

1  At the May 24, 2012 IEP Meeting it was determined
2  by the IEP Team that it would create a new annum IEP
3  that would correspond with the beginning of the
4  academic year versus the calendar year. The IEP team
5  further agreed to coordinate over the summer to
6  minimize the meetings necessary to create and approve
7  the new annum IEP once school started in August 2012.

8  Ethan's annual IEP for the 2012-2013 academic year
9  was finally agreed to and signed on Monday, August 20,
10 2012. The August 2012 IEP consisted of fifteen (15)
11 goals & objectives and, again, most were an evolution
12 from the prior IEP's goals & objectives. The District
13 issued a Prior Written Notice dated Monday, August 27,
14 2012 that recognized the annual IEP and expressed the
15 District's intention to implement.

16 The District was also participating in an IEP audit
17 by the Arizona Department of Education and the parent
18 had been indicated by both the ADE and the District
19 that Ethan's August 2012 IEP would be audited as well.
20 Knowing that the ADE would be reviewing the IEP would
21 provide some indication that the IEP had been written
22 and conformed to IDEA. Parent believed that the August
23 2012 IEP had passed the ADE scrutiny without any
24 changes being recommended.

25 As the parent had been assured by the District that
26 the past problems regarding Ethan's education (e.g. new
27 teacher assigned, training for the new teacher, data
28 management techniques, etc.) have been taken care,

parent felt that Ethan education would be handled in an efficient and effective manner without the repeat of previous procedural issues from prior IEPs.

The August 2010 IEP Progress reports were produced for Ethan in October 2012, December 2012, March 2013, and May 2013. These are the primary indicator used by the parent to determine whether Ethan's progressing and whether the IEP goals & objectives and their implementation are effective.

After the March 2013 IEP Progress report, parent requested through writing on March 20, 2013 an information request specific to Ethan's data sheets from January 2012 through to March 8, 2013 (the last day of the reporting period reflected in the March 2013 IEP Progress report).

After careful analysis of the datasheets provided by the District, certain major discrepancies came evident when comparing the actual datasheets of certain goals & objectives to the claims of specific progress by the District in Ethan's October 2012, December 2012, and March 2013 IEP Progress Reports.

The datasheets represented a significant lack of consistency and implementation of Ethan's IEP for the entire 2012-2013 academic year at WSS. The parent requested Mediation from ADE on April 21, 2013 to discuss his concerns and the District declined the mediation request.

The discrepancies were brought to the attention of the District briefly through written communication on May 15, 2013 and were followed up on May 30, 2013 with another written information request for the rest of the datasheets for the year.

Upon receipt of the datasheets on Tuesday, June 4, 2013, combined with the May 2012 IEP Progress report, further analysis was done and the District was presented with the findings encompassing the entire year through written communication on Sunday, June 9, 2013. Other than denying the request for Mediation, the District at the time of filing the complaint has not responded directly to the information presented.

## PROBLEM/COMPLAINT #1

### FAILURE TO IMPLEMENT THE IEP OF AUGUST 2012

The 9th Circuit Court in *Van Duyn v. Baker School District 5J (2007)* admitted that "*most IDEA cases involve the formulation rather than implementation of an IEP*"[2]. The 9th Circuit goes on in *Van Duyn* to establish a standard of materiality in regards to the implementation of the IEP:

> "*In accordance with the IDEA itself, the Court's decision in Rowley and the decisions of our sister circuits, we hold that a material failure to implement an IEP violates the IDEA.*

---

[2] Van Duyn v. Baker School District, 5J 481 F.3d 770, 47 IDELR 182 (9th Cir. 4/3/2007) p. 3798

1   *…we clarify that the materiality standard does*
2   *not require that the child suffer demonstrable*
3   *educational harm in order to prevail."[3]*

4

5   Also, in *Van Duyn* the 9th Circuit indicates that
6   lack of education progress may indicate a failure to
7   implement the IEP[4]. It is under this premise the parent
8   presents the complaint.

9

10   *"The IDEA allows a party to challenge an*
11   *IEP because of procedural flaws in the IEP's*
12   *formulation as well as "on substantive grounds*
13   *based on a determination of whether the child*
14   *received a free appropriate public education"*
15   *20 U.S.C. § 1415(f)(3)(E)(i). This language*
16   *surely indicates that a failure to implement an*
17   *IEP may deny a child a free appropriate public*
18   *education and thereby give rise to claim under*
19   *statute."[5]*

20

21   It is the parent's intention to present both
22   datasheets and progress reports, along with other
23   evidence (**Synopsis of Supporting Documents**), in its
24   assertion that the District failed to substantially
25   implement the August 2012 IEP, that this is a material

26

27   _____

28   [3] Ibid., p. 3801
     [4] Ibid.
     [5] Ibid., p. 3799

failure under *Van Duyn*, and subsequently results in a denial of FAPE.

After careful analysis of the data sheets and subsequent progress reports of the August 2012 IEP the following issues came to light:

1.  It took several weeks to implement Ethan's IEP, although several of his goals & objectives were similar to his previous ones.
2.  After Ethan achieved mastery on an STO for a specific goal and objective, he was kept on at the STO for weeks to months at a time, before moving to the next STO. (Goals# 1, 3, 6, & 10)
3.  With other goals & objectives there was inconsistency with the approach and the specific STO was not being worked with according to the IEP, thereby unable to be achieved. (Goals# 2, 7, 8, & 11)
4.  Ethan's quarterly IEP Progress reports misrepresented his progress and reported that he had achieved goals & objectives later versus earlier.
5.  Even if Ethan's quarterly IEP Progress report reported that Ethan had achieved an STO, he was kept on at the STO for weeks following the progress reporting date.
6.  For the last reporting periods, from January through to May 2013, Ethan was kept at the STO

#3 (the March 8, 2013 objective) across all of his goals & objectives. If he achieved mastery on a goal and objective it was only at the STO #3 level.

7.  Ethan's final May 2013 Progress Report misrepresented Ethan's achievement against his annual goals & objectives as it indicated that Ethan had achieved ten of fifteen of his annual goals, whereas he had only achieved STO#3.

According to the data sheets, Ethan did not achieve any of his annual goals of his August 2012 IEP; not from lack of Ethan's capability but by the lack of the capability of the District.

As the District has repeatedly emphasized through prior communications Ethan has progressed, that is not the issue here. Parent does not question whether Ethan has progressed or not, nor does parent seek a specific rate of progress. The parent is fully aware that specific rates of progress of the student cannot be guaranteed, but parent does believe that it should have certain performance expectations of the District.

The issue the parent has is that Ethan was not given the "opportunity" to progress because of the lack of appropriate implementation and/or management of his IEP. By either not implementing the goals & objectives according to the IEP or by not progressing Ethan to the

next STO once he mastered led to the loss of the "opportunity" for Ethan to progress accordingly.

Parent also asserts that since the subsequent August 2012 IEP progress reports misrepresented Ethan's progress that this interfered with the parent's participation in the determination of the effectiveness of Ethan's IEP. See 20 U.S.C. § 1415(f)(3)(E)(ii)(II) (IDEA violated if procedural flaws "*significantly impede[] the parents' opportunity to participate in the decision making process regarding the provisions of a free appropriate public education to the parents' child*").

Moreover if the progress report shows that the student is not progressing accordingly, the IEP team must revise the IEP as appropriate to address the lack of expected progress toward the goals[6].

Parent also observed that several items (e.g. Home/School Art Book, gesture signs, "help" & "break" icons, etc.) that were mentioned in the August 2012 IEP, specifically on the "Services and Environment (Form I)" page under "Supplementary Aids/ Assistive Technology and Services for Students" section, had been worked on either inconsistently or not at all throughout the 2012-2013 academic year.

These "Supplementary Aids…" items had been discussed extensively at the August 2012 annum IEP meetings that created the August 2012 IEP and some had

---

[6] IDEA Regulations, 34 C.F.R. § 300.324 (b)(ii)

actually been carry-over from the prior IEP. The lack
of apparent implementation of these items was raised
repeatedly at IEP meetings throughout the year, but to
no avail.

The parent is only seeking from the District to be
held responsible only what they have previously agreed
to through the August 2012 IEP. As the District will
surely present the multitude of meetings with parents,
hundreds of data sheets collected, and the myriad of
communications; volume does not necessarily indicate
quality or substance.

A deprivation of educational benefit under 20
U.S.C. § 1415(f)(3)(E)(III) looks to whether the
District's conduct has actually caused a deprivation of
educational benefit to which Ethan was entitled under
the IEP; its language is not directed to whether the
IEP is reasonably calculated to lead to educational
benefit. A violation of this obligation thus occurs
when the school district fails in its procedural
obligation to implement the IEP that the IEP team has
collaboratively determined to be appropriately and
individually calculated to provide educational benefit.

### PROPOSED RESOLUTION #1a

Considering the lack of "opportunity" for
progression provided to Ethan by the District,
indicated by the datasheets and misrepresented in
Ethan's progress reports, the parent is seeking

compensatory hours for missed educational opportunity in the sum of three hundred and fifty one (351) hours.

This was calculated based on the average of days of lost opportunity made across the August 2012 IEP's goal & objectives of 117 school days (over 70% of the 167 school days between August 27, 2012 and May 22, 2013 that the IEP was active). The actual days are much greater considering the goals & objectives that were not implemented correctly, but initially we will use those that were effectuated properly but were otherwise stagnated. Parent reserves the right to increase this estimate as information is acquired, assessed and presented at the Due Process Hearing.

If we consider Ethan's recent independent evaluation done by a licensed clinical psychologist, Joseph A. Gentry, Ph.D., BCBA-D, and his recommendation of three hours of intensive level of servicing per day we can adjust the number accordingly. This would be 117 days x 3 hours of service resulting in 351 compensatory education hours.

If the parent was to take on solely this amount of hours it would cost the parent, based on the current state-accepted rate for private rehabilitation services of $17.55 an hour, over six thousand dollars ($6,160.05).

The District has asserted previously that IEP's are not to be judged in hindsight, parent agrees with the assertion, although a student's actual progress may be

used to show that an IEP was or was not appropriate. Moreover, an IEP that provides appropriate services for some but not all of the student's identified disabilities may still subject an LEA to liability for compensatory education[7].

The District asserts that IEP's are not to be judged in hindsight, but then defends its actions claiming that IEP goals were not implemented because they were determined unclear or immeasurable. Parent does not believe the IEP team in August 2012 would have knowingly created goals that were unclear or immeasurable at the time of the IEP creation, so why would the District rely on hindsight of those goals as a defense? The District cannot have it both ways.

The District has also asserted that a procedural violation is not a denial of FAPE and is supported by present case law, the parent concurs. A ***single*** (emphasis added) procedural violation is not denial of FAPE, but multiple, repetitive procedural violations can be construed as a material failure to implement the IEP and subsequently a denial of FAPE[8].

## PROPOSED RESOLUTION #1b

As the District seems incapable of appropriately managing and implementing its own educational program regarding Ethan's IEP, we would also like the

---

[7] D.H. and D.H. ex rel. J.H. v. Manheim Township School LEA, No. 05-1113, F. Supp. 2d(E.D. Pa. 2006, 45 IDELR 38.
[8] Ibid. 2, p. 3788

assignment of a recognized independent, third-party to provide supervisory and oversight of Ethan's educational program on a continual basis until such time that the District can provide evidence of the capability to manage Ethan's IEP on their own.

This request is supported by Porter v. Board of Trustees of Manhattan Beach Unified School District[9]. In Porter, a separate order of interim relief was granted by the presiding judge that transferred control of the student's education from the Manhattan Beach USD and the California Department of Education to a Special Master, an independent third party.

**Respectfully Submitted** this 12th day of July, 2013.

_____

Parent/Advocate, Matthew C. Oskowis

By: _____

Matthew C. Oskowis
105 Pony Soldier Road
Sedona, Arizona 86336

---

[9] Porter v. Board of Trustees of Manhattan Beach Unified Sch'l Dist., et al. Case No. CV 00-08402 GAF (USDC, C.D. Cal. 2005)

## Synopsis of Supporting Documents

**"Comparison of Progress Notes versus Data Sheets"** – these three sheets basically summarize the differences in terms of dates of what Ethan's data sheets (received per information request March 20, 2013 and May 20, 2013) indicate versus what Ethan's October 2012, December 2012, March 2013, and May 2013 IEP Progress reports reported.

Each of Ethan's fifteen (15) goals is listed with a verbatim copy of the annum goal from the August 2012 IEP. The range of the data sheets supplied, beginning and end dates, are listed for each goal. Please note that none of the goals data sheets indicate that they were started until at least a week (almost three weeks in one case) after the District had issued a PWN regarding the August 2012 IEP.

Each of the three reporting periods (October 2012, December 2012, and March 2013) are broken up into separate column groups, within each of these column groups there are three columns:

**"Started"** – this indicates the start date, according to the datasheets, of when the STO related to that reporting period was started.

**"Achieved"** – this indicates the date, according to the datasheets, that Ethan had achieved mastery according to the August 2012 IEP.

**"Reported"** – this indicated the date, according to the corresponding progress report, that Ethan was reported to have achieved mastery.

The four goals highlighted in yellow (Goals# 1, 3, 6, and 10) are those goals in which Ethan had consistently achieved mastery of the specific STO early on within the reporting period but was left to continue on with that STO.

"**Comparison Notes**" – these are parent notes & observations regarding the datasheets and progress reports.

"**Comparison Days Lost**" – here is the heart of the matter. This page illustrates what the parent believes is school days of lost "opportunity" because once Ethan had achieved a goal he was not progressed to the next STO. This is indicated by the "**Δ Start**" column. Parent also considered how rapidly Ethan was able to achieve the STO in school days once he did start on it (both per data sheets and progress report). These are represented by the columns of "**Δ Achieve**" and "**Δ Report**" respectively.

rogress Notes versus Data Sheets

| ...tion | Data Sheets Set #1 | | Data Sheets Set #2 | | STO #1 (10/12/2012) | | | STO #2 (12/21/2012) | | | STO #3 (3/8/2013) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Start | End | Start | End | Started?? | Achieved | Reported | Started | Achieved | Reported | Started | Achieved | Reported |
| ...natch 8 color words (red, blue, green, ...nge, purple, brown, black) in blacktype with ...nding color swatch in a field of 8, with 80% ...ross 3 consecutive instructionalsessions as ...sing a trial-by-trial data sheet. Data will be ...r each instructional session. | 7-Sep-12 | 8-Mar-13 | 17-Apr-13 | 17-May-13 | 27-Aug-12 | 24-Sep-12 | 4-Oct-12 | 14-Nov-12 | 13-Dec-12 | 13-Dec-12 | 11-Feb-13 | | NR |
| ...otos of familiar people (e.g., Traci, Mary, ..., and two peers) in an array of 6, Ethan will ...correct photo to the corresponding printed ...80% accuracy across 3 ...instructional sessions, using a trial by trial ...Data will be collected for each ...al session. | 12-Sep-12 | 8-Mar-13 | 11-Apr-13 | 21-May-13 | 27-Aug-12 | 17-Sep-12 | 17-Sep-12 | *See Notes | | | | | |
| ...natch 10 shapes (circle, square, triangle, ...nd, hexagon, octagon,rectangle, heart, ...array of 3, with 80% accuracy across 3 ...e instructional sessions, recordedusing a ...l data sheet. Data will be collected for each ...al session. | 7-Sep-12 | 8-Mar-13 | 10-Apr-13 | 22-May-13 | 27-Aug-12 | 1-Oct-12 | 24-Sep-12 | 26-Nov-12 | 12-Dec-12 | 21-Dec-12 | 14-Jan-13 | 16-Jan-13 | 16-Jan-1 |
| ...ided with set up Ethan will independently ...rfaces of his teeth with 100%accuracy ...nsecutive instructional sessions. He will be ...sing duration recording. Data will ...l for each instructional session. | 7-Sep-12 | 8-Mar-13 | 27-Mar-13 | 30-Apr-13 | 27-Aug-12 | 11-Sep-12 | 11-Sep-12 | 13-Nov-12 | *See Notes | | | | |
| ...lassroom computer, Ethan will ...ntly open 2 different web browsers in ...ocations and click on the bookmark to a ...bsite in more than one location, with 80% ...ross 3 consecutive instructional sessions, ...sing a task analysis data sheet. Data will be ...reach instructional session. | 10-Sep-12 | 8-Mar-13 | 11-Apr-13 | 16-May-13 | 27-Aug-12 | *See Notes | | 13-Nov-12 | 15-Nov-12 | 12-Dec-12 | 12-Dec-12 | | |
| ...levelop his social ...com/communication skills by participating in a ...urn-taking activity of up to 3 exchanges on ...unities over 2 days with decreasing physical ...ompting, partial prompting, visual supports ...asured by trial-by-trial data collection. Data ...cted for each instructional session. | 7-Sep-12 | 7-Mar-13 | 4-Apr-13 | 3-Jun-13 | 27-Aug-12 | *See Notes | | 13-Nov-12 | 12-Nov-12 | *See Notes | 14-Jan-13 | 16-Jan-13 | *See Note |

1 - 5

# rogress Notes versus Data Sheets

| Goal | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ECS book, sentence strip with the "I want" ...ed to the left end of it and photo icons on ...his book that represent the materials in ...tines/activities, Ethan will request ..."missing" items (e.g., a spoon to eat his ...attaching it to the sentence strip, and ...o his communicative partner with 80% ...cross 3 consecutive instructional sessions, as ...using trial-by-trial data sheets and related ...vider notations. Data will be collected for ...ctional session. | 11-Sep-12 | 5-Mar-13 | 10-Apr-13 | 20-May-13 | 27-Aug-12 *See Notes | | | | | | |
| os of six 3-step actions, Ethan will complete ...described with 100% accuracy across 3 ...3 instructional sessions, recorded using a ...l data sheet. Data will be collected for each ...session. | 17-Sep-12 | 5-Feb-13 | 11-Apr-13 | 21-May-13 | 27-Aug-12 *See Notes | | | | | 14-Jan-13 *See Notes | |
| jects (e.g., cow, horse, dog, duck, cat, car, ...ol bus, fire truck, motorcycle,jeep, ..., police car), and mats or story boards ...g 2 categories (animals and vehicles), ...rt objects into the appropriate categories ...curacy across 3 consecutive instructional ...corded using a trial by trial data sheet. Data ...cted for each instructional session. | 10-Sep-12 | 7-Mar-13 | 1-May-13 | 3-Jun-13 | 27-Aug-12 *See Notes | | 13-Nov-12 *See Notes | | | | |
| rational/reinforcing materials, in structured ...ctured environments, Ethan will engage in ...ntal age appropriate parallel play near ...0 minutes, with no prompts, across ...ve instructional sessions, as measured by ...a collection/notations. Data will be ...r each instructional session. | 11-Sep-12 | 7-Mar-13 | 10-Apr-13 | 22-May-13 | 24-Sep-12 *See Notes | 28-Sep-12 | 13-Nov-12 | 15-Nov-12 *See Notes | 17-Dec-12 | 14-Jan-13 | 16-Jan-13 *See Note |
| utline of 3 different shapes on a half sheet ...e paper (e.g. square, circle,triangle), Ethan ...t the area of the shape with 80% coverage, ...opportunities over 3 ...instructional sessions, as measured by a ...permanent product to record data. Data ...cted for each instructional session. | 19-Sep-12 | 5-Mar-13 | 5-Apr-13 | 21-May-13 | 27-Aug-12 *See Notes | | 14-Nov-12 | | | 15-Jan-13 | |
| ple oral instructions (e.g., hands up, pick it ...ull, give me, take) from 2people and in 2 ...ttings, Ethan will follow instructions with ...cy across 3 consecutive instructional ...corded using a trial-by-trial data sheet. ...e collected for each instructional session. | 12-Sep-12 | 7-Mar-13 | 10-Apr-13 | 20-May-13 | 27-Aug-12 *See Notes | | 13-Nov-12 | | | 15-Jan-13 | |

rogress Notes versus Data Sheets

| Description | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| als of 6 object motor actions (e.g., shake a l a ball, push a car on a track, fly a plane, ble wand, put a piece into a Mr. Potato a direction to "do this," Ethan identify imitate the object motor action ccuracy across 3 consecutive instructional corded using a trial by trial data sheet. Data cted for each instructional session. | 7-Sep-12 | 7-Mar-13 | 4-Apr-13 | 3-Jun-13 | 27-Aug-12 *See Notes | 28-Sep-12 | 13-Nov-12 | 15-Jan-13 | 7-Mar-1 |
| ndependently rise to a stand from the floor -kneel position, with only one hand for times in one session, on 3 different easured using staff logs. Data will l for each instructional session. | 7-Sep-12 | 7-Mar-13 | 10-Apr-13 | 3-Jun-13 | 27-Aug-12 *See Notes | | 6-Dec-12 | 14-Jan-13 | 7-Mar-1 |
| ed on a playground swing and after being h to start, Ethan will pumpthe swing by wing his arms, trunk, and/or legs 12 times vice in one session, over 3 differentsessions, ssing staff logs. Data will be collected for | 17-Sep-12 | 5-Feb-13 | 10-Apr-13 | 21-May-13 | 27-Aug-12 | | 13-Nov-12 | 15-Jan-13 | 7-Mar-1 |

3 - 5

## Goal #  Notes

| Goal # | Notes |
|---|---|
| * | None of Ethan's goals and objectives were progressed past STO#3... The April and May data sheets, for every goal and objective reflect STO#3 as their objective and this is the objective they achieved if they achieved it... Again this was misrepresented in Ethan's final May 2013 IEP Progress report as it was indicated Ethan completing ten of his fifteen annual goals and objectives which does not reflect what the data says. So basically Ethan had the same academic program for most if not all the first five months of 2013, with no concern or regard in progressing him. |
| 1 | STO#1 being "Ethan will match 8 color words printed in the corresponding color...", according to the data he had achieved mastery of this goal on Sept. 10th, 18th, and 24th respectively. This goal was continued as-is until November 13th, fifty days after he mastered the goal and thirty-two days after the October 2012 IEP Progress reported he mastered it when he should have been working on the next STO. |
| 2 | STO #1 is with an array of six Ethan will match the correct photo to a photo with the corresponding word (emphasis added). According to the data sheets they were matching picture to picture until January 22nd, where they started using picture with the name on the picture (the actual STO#1), this continued until the end of the available data sheets (March 8, 2013), thus they never moved on to STO#2 of matching photo to the corresponding printed word. |
| 3 | According to the datasheets, even though they reported correctly that Ethan had achieved STO #3 by January 16th, by March 8th (the last available data sheet) they were still working on STO#3. |
| 4 | According to the datasheets Ethan achieved STO #1 - tolerating the toothbrush on his teeth for 10 seconds. But when they tried to move to STO#2 for 20 seconds, they were unable to place on his teeth? This brings to question if they ever achieved STO #1 in the first place? This particular goal was changed at the February 26, 2013 IEP Meeting. October 2012, December 2012, and March 2013 progress reports were based on the previous version of the goal. As of the last data sheet of March 8, 2013, Ethan had not achieved STO #2. |
| 5 | This goal was the basis for Item #3 of previous ADE Complaint Reference #2329 in which the District was found non-compliance. According to the datasheets Ethan achieved STO #2, without achieving STO #1, within three sessions on November 15, 2012, utilizing the same criteria that the progress reports determines he mastered STO #2 on December 12. As of the last data sheet of March 8, 2013, Ethan had not moved to STO #3. |
| 6 | STO #1 is Ethan will participate in a turn taking activity with an adult (emphasis added) for 3 exchanges with full physical prompting. From September 7, 2012 through November 9, 2012 there was not three consecutive instructional sessions with an adult. The trials varied from adult, other student, peer, class mate, etc. with apparent little emphasis on satisfying STO #1. STO #2 was then initiated November 13, 2012 (without satisfying STO #1) with Ethan satisfying the STO within three days, and then on January 14 it switched to STO#3, which again he achieved within three days. As of the last data sheet of March 7, 2013 Ethan had not moved from STO #3. |
| 7 | STO #1 is Ethan will request 3 needed "missing" items... beginning September 11, 2012 through to January 14, 2013 there was no intention of doing 3 items together in three consecutive session to actually realize the STOs. By request of the District and the November 2012 IEP Meeting, the SLP changed Ethan's goal. Even though there was a PWN issued November 30, 2013, his goal did not change accordingly until January 14, 2013. Dates were changed on the target dates of the STOs of the new goal, but were not reflective in subsequent reporting. |
| 8 | STO #1 is Ethan given photos of two 3-step actions and partial physical prompts... beginning September 17, 2012 through to February 5, 2013 there was no intention of doing the two 3-step actions together in there consecutive session to actually realize the STOs. Ethan did not master STO #1 by the end of the year. |
| 9 | STO #1 is Ethan given 5 objects and gestural prompts, Ethan will sort objects into two corresponding categories. Ethan, during the time frame of the data sheets, never actually achieves STO #1, but is subsequently moved to STO #2 and STO #3. Ethan did not master STO #1 by the end of the year. |
| 10 | Ethan achieved STO#1, within three sessions on September 24, 2012, utilizing the same criteria that the progress reports determines he mastered STO #1 on September 28. Again even though Ethan had mastered STO #1, he remained with STO #1 until changed on November 13, 2012, which Ethan, within three sessions, achieved STO #2. Even though mastered STO #2, he remained with STO#2 until changed on January 14, 2012, which Ethan, within three sessions, achieved STO #3. Ethan remained at STO #3 as far as the data sheets indicated (March 7, 2012). |
| 11 | STO #1 is Ethan given and outline of 3 different shapes (e.g. square, circle, triangle) over a half sheet of letter size paper (emphasis added) will color in the 3 shapes with 25% coverage. Ethan never achieved STO #1, but was changed to STO #2 and though never achieving STO #2, was moved to STO#3. Oddly enough the sheets initially used were three separate sheets with a square, circle, and triangle taking up half the page, but on November 15, 2012 the sheets were changed to a single sheet with the three shapes placed next to each other. Ethan did not master STO#1 as far as the data sheets indicated (March 7, 2013). |
| 12 | This goal is the same goal from Ethan's December 2011 IEP Goal #12, which according to May 2012 IEP Progress report Ethan had nearly achieved his annum. Ethan never achieved STO #1, but was changed to STO #2 and though never achieving STO #2, was moved to STO #3. Ethan did not master STO #1 as far as the data sheets indicated (March 7, 2013). |
| 13 | The PWN for the August 2012 IEP was dated August 27, 2012, thus how can Ethan have achieved his STO#1 just one day after the PWN issued? Nevertheless, Ethan continued on STO #1 after mastery until November 14, 2012. There was no intention of giving the models of motor actions consistently in consecutive sessions to actually realize the STOs. |
| 14 | Ethan never achieved STO #1, but was changed to STO #2 and though never achieving STO #2, was moved to STO #3. Ethan did not mater STO#1 as far as the data sheets indicated (March 7, 2013). Ethan's PT in January 2013 recommended that Ethan no longer requires PT, we asked that she actually perform a formal assesment of Ethan, before we would agree to have the service terminated. |
| 15 | Ethan never achieved STO #1, but was changed to STO #2 and though never achieving STO #2, was moved to STO #3. Ethan did not master STO#1 as far as the data sheets indicated (March 7, 2013). |

Comparison Days Lost

| Goal # | STO #1 (10/12/2012) School Days: 33 | | | STO #2 (12/21/2012) School Days: 45 | | | STO #3 (3/8/2013) School Days: 43 | | | Annum* |
|---|---|---|---|---|---|---|---|---|---|---|
| | Δ Start | Δ Achieve | Δ Report | Δ Start | Δ Achieve | Δ Report | Δ Start | Δ Achieve | Δ Report | Δ Start |
| 1 | 9 | 20 | 28 | 36 | 17 | 17 | 32 | | | 48 |
| 2 | 12 | 16 | 15 | | | | | | | |
| 3 | 9 | 25 | 20 | 34 | 13 | 20 | 14 | 3 | 3 | 48 |
| 4 | 9 | | | 44 | | | | | | |
| 5 | 10 | | | 22 | 3 | 17 | | | | |
| 6 | 9 | 9 | | 22 | | | 30 | 3 | 3 | 48 |
| 7 | 11 | | | | | | | | | |
| 8 | 15 | | | | | | | | | |
| 9 | 10 | | | | | | | | | |
| 10 | 11 | | | 35 | 3 | 20 | 28 | 3 | 3 | 48 |
| 11 | 17 | | | | | | | | | |
| 12 | 12 | | | | | | | | | |
| 13 | 9 | | | 31 | | | | | | |
| 14 | 9 | | | | | | | | | |
| 15 | 15 | | | | | | | | | |
| AVG | 11 | 20 | 21 | 32 | 9 | 19 | 26 | 3 | 3 | 48 |

Δ Start Total:     117
Total IEP Days:    167
Δ Start Total %:   70% (70% of Ethan's academic year was spent in missed educational "opportunity" to progress)

* Annum is calculated based on that none of Ethan's goals were moved past STO #3 for the remainder of the year

Δ Start - Number of school days of missed opportunity because the curriculum was not moved forward once mastery occurred.
Δ Achieve - Number of school days that Ethan actually took to achieve mastery of the STO, according to the data sheets.
Δ Report - Number of school days that were reported in progress reports that Ethan took to achieve master of the STO.

# Exhibit B



Matthew C Oskowis (Pro Se)
105 Pony Soldier Road
Sedona, Arizona 86336
(602) 523-1863
Matthew.Oskowis@wellsfargo.com

Tuesday, September 3, 2013


ARIZONA DEPARTMENT OF EDUCATION

OFFICE OF DISPUTE RESOLUTION


```
                              )
                              )
                              ) Due Process Complain Notice
                              )
                              )
                              )
_____ )
```

This request is being initiated by the parent of Ethan Corbin Oskowis a nine-year old non-verbal autistic currently residing at the above address and attending West Sedona School ("WSS") in the Sedona Oak Creek Unified School District #9 ("District"), Sedona, Arizona.

This Due Process Complaint ("Complaint") has no relationship, other than parties involved, with the prior Due Process Complaint OAH No. 14C-DP-006-ADE. This Complaint is regarding information and activities regarding the District that came to light after the filing of the prior Due Process Complaint (14C-DP-006-ADE) on July 12, 2013.

The District appears to have engaged in a campaign to intentionally and deliberately minimize, if not eliminate, parental involvement regarding the educational placement and services of Ethan Oskowis

**VIOLATIONS OF IDEA**

As it would appear with prior Due Process Complaints the District necessitates knowing what specific statutes of the IDEA were violated per the complaint, the following IDEA statutes, but not limited to, are presented here:

1.   34 C.F.R. § 300.305(a) – Review of existing evaluation data

2.   34 C.F.R. § 300.306(a) – Determination of eligibility

3.   34 C.F.R. § 300.322(a) – Public agency responsibility

4.   34 C.F.R. § 300.323(d) – Accessibility of child's IEP to teachers…

5.   34 C.F.R. § 300.324(b) – Review and revision of IEPs

6.   34 C.F.R. § 300.501(a) – Opportunity to examine records

7.   34 C.F.R. § 300.501(b) – Parent participation in meetings

8.   34 C.F.R. § 300.503(a) – Notice

9.   34 C.F.R. § 300.613(a) – Access rights

**BACKGROUND**

Ethan Corbin Oskowis was diagnosed with classical infantile autism on March 23, 2006, shortly after his second birthday. To this day Ethan is non-verbal and uses augmented communication systems called PECS (Picture Exchange Communication System) to communicate his wants and needs.

Ethan has been a student of West Sedona School in the Sedona Oak Creek Unified School District since March 11, 2010. Ethan had arrived at West Sedona School with an already active IEP from his prior school, Chrysalis Academy of Tempe, Arizona, dated December 11, 2009. The IEP had twenty-one goals & objectives and called out specific methodologies (e.g. PECS, Discrete Trial Training, etc.) that had proven successful with Ethan at Chrysalis Academy.

At the conclusion of the 2009-2010 academic year and after not seeing reasonable progress against Ethan's goals & objectives stated in Ethan's December 2009 IEP, on July 19, 2010 parent requested mediation from Arizona Department of Education between himself and the District. On August 27, 2010 the first of two Mediation meetings was held at the District's offices. On September 27, 2010 the second of two Mediation meetings was held at the District's offices. During the second of two Mediation meetings an agreement was reached between the parent and the District and entered into record with the Arizona Department of Education under Mediation Reference #11-012.

At the conclusion of the 2010-2011 academic year and again not seeing reasonable progress against Ethan's goals & objectives stated in Ethan's December 2010 IEP, on or about September 26, 2011 the parent again requested mediation from Arizona Department of Education between themselves and the District.

On October 25, 2011 the mediation meeting was held at the District's offices. During the meeting an agreement was reached between the parent and the District and entered into record with the Arizona Department of Education under Mediation Reference #12-15.

Before the October 2011 Mediation meeting District produced Ethan's October 2011 progress report. This report showed Ethan had made substantial progress against all of his goals & objectives, whereas previous progress reports in March 2011 and in May 2011 showed only marginal progress against some of Ethan's goals & objectives.

Included with the October 2011 progress report was a collection of datasheets corresponding with not only the October 2011 progress report but the previous progress reports as well.

After careful analysis of the datasheets provided by the District, certain discrepancies came evident when comparing the actual datasheets of

certain goals & objectives to the claims of specific progress by the District in Ethan's October 2011 progress report. But even with the discrepancies, the data sheets showed Ethan had made substantial more progress in nearly two months (September and October, 2011) than he had in the prior fifteen months of academic service provided by the District.

In the December 8, 2011 IEP Meeting, the IEP Team finalized Ethan's 2011 IEP. Several meetings were utilized in the creation of the IEP with extensive discussion on the specifics of Ethan's goals & objectives and the participation of Ethan's principal evaluator, Andrew Gardner, Ph.D., BCBA-D. The December 2011 IEP had seventeen goals & objectives, most of them are the evolution of Ethan's prior goals & objectives from his December 2010 IEP. As the school was able to show Ethan achieving rapid progress in the last few months of 2011 with his December 2010 IEP parent expected the school should be able to continue the momentum since the goals & objectives were not much different from his prior IEP.

Towards late January 2012, parent requested to review the data sheets and upon review noticed not only the data sheets had been changed in format, but the datasheets reflected not all the goals & objectives were being worked on. Upon parent inquiry, parent was informed, due to the input of an outside consultant, Trina D. Spencer, Ph.D., BCBA, the decision was made certain goals & objectives were going to need to be changed. When parent expressed displeasure in not being informed previously of these changes to Ethan's IEP before they were implemented, District asked parent to meet with Trina D. Spencer to allow her to explain why she had made the changes.

Parent was also told by the District he had agreed to bringing on an outside consultant to "provide supervisory and oversight for SOCUSD" and this is what they had done. In actuality, there had been no formal agreement, although it was expressed as a desire by the parent for the District to

1  employ an outside "expert" during the IEP meetings utilized in the creation

2  of the December 2011 IEP. When the parent had inquired directly whether or

3  not the District would be employing the services of an outside "expert"

4  parent was never given a definitive commitment, and it was not reflected in

5  any documentation. The only mention of an outside "expert" was expressed in

6  the December 2011 IEP in the Parent Notes Section, which parent understood

7  only expresses the desires of the parents and is not considered enforceable

8  by either party.

9       Parent had a meeting with Dr. Trina D. Spencer on February 16, 2012 and

10 parent was explained first of all Dr. Spencer did not understand some of the

11 goals & objectives, thereby she was unsure and/or unable to implement them.

12 As these were goals & objectives had been created by the IEP Team over

13 several meetings the parent was a bit perplexed why there would be any

14 confusion. Parent also raised the concern of why the parent had to raise the

15 issue regarding the changes first before parent was "brought-in-the-loop" as

16 it were.

17      The one individual who had been a participant and the major contributor

18 to the goals & objectives of both Ethan's 2010 and 2011 IEP, Shannon J. Lund,

19 a licensed speech-language pathologist, could have easily cleared up any

20 confusion regarding his December 2011 IEP. Unfortunately parent found out the

21 District had apparent difficulty in paying Shannon J. Lund's invoices thereby

22 she was subsequently unavailable to provide the appropriate information. As

23 she was the only person who had been consistent over the recent

24 administration and staff turn-over, parent felt it would be necessary for her

25 to provide the insight into Ethan's education program. Parent's repeated

26 inquiries to the lack of Shannon J. Lund attendance in meetings and trainings

27 was met with indifference.

28

At the IEP Meeting on February 24, 2012, Dr. Trina D. Spencer expressed she would like to change Ethan's goals from a "visual" to "receptive" based programming. Again parent expressed our concern the District was not working on the IEP as defined in December 2011, but was working on a modified version according to what Trina D. Spencer had defined.

On March 9, 2012 parent received Ethan's March 2012 Progress Report and there were several of his goals & objectives which had the following verbiage "Instructional programs are developed for this goal but formal instruction and data collection will be implemented consistently in the forthcoming quarter." This confirmed parent's worst fear; the District was selectively implementing his IEP under the guise since some of these goals & objectives were going to be changed anyway there was no point in working on them. This had been a repeated pattern whereas the District had decided, because there needed to be changes to Ethan's goals & objectives in his IEP, as a reason to not implement the current goals & objectives as-is.

Parent filed a complaint with the Arizona Department of Education, Complaint Reference #2317, on April 4, 2012 and subsequently the ADE found the District was in noncompliance for "*failure to implement the IEP goals in a manner consistent with the Student's December 8, 2011 or the District's own proposal that the goals be implemented in January of 2012 is a clear procedural violation of the IDEA regulations*". Although the ADE did propose corrective action in the form of in-service training, the ADE did not specifically answer to the question of whether or not FAPE had been denied.

At the May 24, 2012 IEP Meeting it was determined by the IEP Team that it would create a new annum IEP that would correspond with the beginning of the academic year versus the calendar year. The IEP team further agreed to coordinate over the summer to minimize the meetings necessary to create and approve the new annum IEP once school started in August 2012.

Ethan's annual IEP for the 2012-2013 academic year was finally agreed to and signed on Monday, August 20, 2012. The August 2012 IEP consisted of fifteen (15) goals & objectives and, again, most were an evolution from the prior IEP's goals & objectives. The District issued a Prior Written Notice dated Monday, August 27, 2012 that recognized the annual IEP and expressed the District's intention to implement.

The District was also participating in an IEP audit by the Arizona Department of Education and the parent had been indicated by both the ADE and the District that Ethan's August 2012 IEP would be audited as well. Knowing that the ADE would be reviewing the IEP would provide some indication that the IEP had been written and conformed to IDEA. Parent believed that the August 2012 IEP had passed the ADE scrutiny without any changes being recommended.

As the parent had been assured by the District that the past problems regarding Ethan's education (e.g. new teacher assigned, training for the new teacher, data management techniques, etc.) have been taken care, parent felt that Ethan education would be handled in an efficient and effective manner without the repeat of previous procedural issues from prior IEPs.

The August 2012 IEP Progress reports were produced for Ethan in October 2012, December 2012, March 2013, and May 2013. These are the primary indicator used by the parent to determine whether Ethan's progressing and whether the IEP goals & objectives and their implementation are effective.

After the March 2013 IEP Progress report, parent requested through writing on March 20, 2013 an information request specific to Ethan's data sheets from January 2012 through to March 8, 2013 (the last day of the reporting period reflected in the March 2013 IEP Progress report).

After careful analysis of the datasheets provided by the District, certain major discrepancies came evident when comparing the actual datasheets

1  of certain goals & objectives to the claims of specific progress by the

2  District in Ethan's October 2012, December 2012, and March 2013 IEP Progress

3  Reports.

4      The datasheets represented a significant lack of consistency and

5  implementation of Ethan's IEP for the entire 2012-2013 academic year at WSS.

6  The parent requested Mediation from ADE on April 21, 2013 to discuss his

7  concerns and the District declined the mediation request.

8      The discrepancies were brought to the attention of the District briefly

9  through written communication on May 15, 2013 and were followed up on May 30,

10  2013 with another written information request for the rest of the datasheets

11  for the year.

12      Upon receipt of the datasheets on Tuesday, June 4, 2013, combined with

13  the May 2012 IEP Progress report,. further analysis was done and the District

14  was presented with the findings encompassing the entire year through written

15  communication on Sunday, June 9, 2013. Other than denying the request for

16  Mediation, the District at the time of filing the complaint has not responded

17  directly to the information presented.

18

19                          **COMPLAINT(S)**

20                      **EDUCATIONAL RECORDS**

21      On Wednesday, July 3, 2013 parent filed a written request for student

22  records. In the written request parent identified specifically the records

23  sought:

24      "like a complete set copied of Ethan's student record file;

25          to include, but not limited to, all tests, test protocols,

26          interval trial data, electronic communications (e.g. email,

27          facsimile, etc.), all other form(s) of raw data, reports,

28          evaluations, grades, notes by teachers or other staff

1   members, memoranda, photographs – in short, **everything** in

2   Ethan's school record file or that should be."

3

4   Per 34 C.F.R. 300.613(a) the District needed to "*comply with the*

5   *request without unnecessary delay… in no case more than 45 days after the*

6   *request has been made*". This would put the 45-day timeframe ending on August

7   17, 2013.

8   The District indicated that the records request was available for

9   pickup via email on August 9, 2013. With the box of records there was a

10  letter to acknowledge the receipt of the documents for the parent to sign

11  upon picking up. One could assume that according to both the email and the

12  acknowledgment letter that this was the "complete" set of Ethan's education

13  records as requested.

14  Upon review of the records presented, parent realized that substantial

15  amount of the records appeared to be missing from the alleged "complete" set

16  of Ethan's educational record. The District did not provide an inventory

17  sheet with the "educational record" so parent will attempt to create one

18  here:

19      1. Copies of IEP Related materials: printed copies of the IEP, Prior

20         Written Notices, IEP Meeting Agendas, Meeting Notes, etc. This

21         appears to be severely lacking since there is very little

22         representation of the 2011-2012 academic year. Plus there are

23         critical documents missing from the first half of the 2012-2013

24         academic year (e.g. a Prior Written Notice sent on October 30,

25         2012)

26      2. Copies of data sheets from 2010-2011, 2011-2012, and 2012-2013

27         academic years.

28

3.  Copies of About-My-Day (a.k.a. Buddy Book) for 2010-2011, 2011-2012, and 2012-2013 academic years.

4.  Miscellaneous items in E.O.'s folder at West Sedona School.

Parent filed a "MOTION FOR STUDENT RECORDS" with Arizona Office of Administrative Hearings ("Tribunal") under Complaint No.: 14C-DP-006-ADE, indicating that the "educational records" were incomplete citing the large quantity of communications, both via email and letters that had been between the District and the parent not present.

District indicated that another box of "educational records" was available for pickup via email on Saturday, August 24, 2013. As before, with the box of records there was a letter to acknowledge the receipt of the documents for the parent to sign upon picking up. The acknowledgement letter had the following inventory:

1.  Prior-Written Notices

2.  Meeting Notices

3.  Parent-District correspondence

One could again try to assume that the District had now complied with providing a "complete" set of educational record, but at a parent-teacher conference held on Thursday, August 29, 2013, the District presented yet another packet of information as part of the "educational records".

The parent has no assurance at this time whether he has Ethan's "complete" educational record or not. And as the bulk of the information that was provided by the District was after the 45-day mark of August 17, 2013, it would appear that the District was deliberately not fulfilling a request according to IDEA and in violation of **34 C.F.R. § 300.501(a)** and **34 C.F.R. § 300.613(a)**. Parent believes that this delay was to make sure certain

1  information was not provided until after the annual IEP Meeting that were

2  held on August 14 and August 15.

3

4  **Multidisciplinary Evaluation Team Report**

5  A meeting was held Thursday, May 9, 2013 regarding the Independent

6  Education Evaluation ("IEE") that had been done by Dr. Joseph Gentry in April

7  2013. The meeting's intention was to discuss Dr. Gentry's findings and

8  recommendations, plus the District wanted to take the opportunity to make a

9  determination regarding special education eligibility as well. During the

10  meeting a brief discussion took place between Ethan's teacher, Kenneth

11  Baumgartner, and the school psychologist, Kelly Murdock, regarding Ethan's

12  eligibility for special education.

13  Two key areas of need were not representative at the meeting, the

14  occupational therapist and the speech therapist, and due to Ethan's extensive

15  needs would be considered by this parent essential to a Multidisciplinary

16  Evaluation Team if that was the intention of the meeting.

17  There was no discussion or review of a Multidisciplinary Evaluation

18  Team ("MET") Report, other than regarding eligibility, but the MET Report

19  that was eventually presented stated a "*Date of Determination*" and "*Date*

20  *Review of Existing Data Completed*" as of May 9, 2013, coinciding with the

21  date of the meeting. Additional information was added "after-the-fact" as

22  seen by the category "*Occupational Therapy Evaluation*" dated May 14, 2013.

23  This is another example of the District having a brief discussion to a

24  document which is supposed to be reviewed in its entirety by the IEP TEAM,

25  including the parent. The document was not distributed and the discussion was

26  limited between Ethan's teacher, Kenneth Baumgartner, and the school

27  psychologist, Kelly Murdock. The document was then distributed at a later

28  time under the guise as it had been reviewed and then used as the basis for

the subsequent modifications to the annual IEP in August 2013. This is a violation of the IDEA under **34 C.F.R. 300.306(a)**, **34 C.F.R 300.305(a)** and subsequently **34 C.F.R 300.324(b)**.

### ANNUAL IEP MEETING

Unfortunately, looking back to the IEP meetings that were held on Wednesday, August 14th and Thursday, August 15th, parent can only express the disappointment of how far we, as an IEP Team, have fallen from the cooperative effort. Those meetings were supposed to be representative of a collaboration of the IEP Team in generating an IEP that meets the specific and individual educational needs of Ethan. The IEP meetings were little more than the recitation of an already predefined IEP that the District had created.

Scott Keller, Director of Student Services, presided over the meetings and it would appear that his sole intent was to eliminate any type of discussion or input of the parents that ran counter to the District.

This all started months prior when Ethan's IEP was modified sometime between March and May of 2013. As the indicated by the copies of the IEP's included with both March 2013 IEP progress report and May 2013 IEP progress report, there had been substantial changes to the IEP, particularly in the Present Levels of Academic Achievement and Functional Performance ("PLAAFP"). These changes were never discussed with the parents, nor mentioned in an IEP meeting, nor documented in a Prior Written Notice ("PWN"); they were just made surreptitiously and changed a rather objective depiction of Ethan to a rather subjective one. This was done in violation of IDEA regulations **34 C.F.R. § 300.324(b)** and **34 C.F.R. § 300.503(a)**.

As the modified version of the IEP was made available to Rebecca Belanger, Ethan's teacher for his 2013 Extended School Year and the start of

2013-2013 academic school year, this also violates **34 C.F.R. § 300.323(d)**, as the incorrect IEP was provided.

Not wanting to lament on the illicit nature of somebody just going about changing an IEP without following proper procedures both on a state and federal level, parent cannot overlook that this modified version was also the basis for the first draft of the IEP ("2013 IEP Draft1") presented via email on August 9, 2013. The 2013 IEP Draft1 had some minor changes to the Present Levels of Academic Achievement and Functional Performance ("PLAAFP"), but the majority of it was basically copied over from the altered May IEP. Any aspect that indicated Ethan's current levels was basically carried over from the prior year, but all aspects of parent's notes, which were rather extensive, were stripped out. Ten new goals were included in 2013 IEP Draft1, with the appearance of Short Term Objectives (STO's) for most but not all of the goals and objectives.

Less than three hours before the August 14th IEP Meeting, the second draft of the IEP ("2013 IEP Draft2") was sent out via email. The 2013 IEP Draft 2 had extensive changes to the PLAAFP and it appeared that some information had been brought forward from the Ethan's August 2012 IEP and other information had been removed. So the parent was left to contemplate and attempt to reconcile the differences between four documents: the August 2012 IEP, the May 2013 modified IEP, IEP Draft1 and IEP Draft2.

At the August 14th meeting the parent expressed that they had not sufficient time to review the changes or had the ability to reconcile the differences. This was met with indifference and the statement that is what the IEP Team was there at the IEP meeting to do. As had been pointed out by the parent, some information had just been copied over from prior versions of the IEP; unfortunately it was unclear from where or why the information was copied.

1    In the meeting "*Section 2: Evaluation Information*" was entirely skipped

2  under the guise that this was copied from MET Report, and that was not the

3  case as pieces were brought in from three separate documents, including

4  information that had been surreptitiously added between March and May 2013.

5  The MET Report was never actually reviewed by the IEP Team as mentioned

6  previously in this complaint.

7    As the District had stated in the meeting that the IEP was supposed to

8  be a "brand new" document unfortunately there was information that was copied

9  form prior documents. For example, there was a passage in the IEP in the

10 section regarding "*Current Classroom-Base Data*":

11    "*Special education reports Ethan does well with learning new*

12    *tasks and procedures. This serves him well as it allows him to*

13    *readily participate in the instructional environment. Data*

14    *collected between January and August 2013 and ESY indicate that*

15    *Ethan has acquired the skill of pointing to indicate an item he*

16    *wants, following a visual cue paired with a vocal cue initiated*

17    *by an adult*".

18    This passage was copied directly from the August 2012 IEP with the year

19 changed from 2012 to 2013; this was specifically and deliberately copied and

20 then altered to appear as updated. This would appear that the District was

21 attempting to shortcut the process, claiming that this was a "new" IEP and

22 the District stated that the parent should focus on the specific draft only,

23 although pieces had been obviously copied from multiple prior documents.

24    As had been stated at the August 14th Meeting the parent wanted the

25 current parental input from the prior IEP to be included and the parent would

26 supplement after the IEP Team had concluded the IEP creation process. The

27 parental input did not appear in the IEP Draft #2 as they had been removed in

28 their entirety.

1    As the IEP Team progressed through the August 14th meeting, parent

2  expressed that parent would like to reserve the right to review the

3  information provided in the PLAAFP and would provide input at the subsequent

4  IEP meeting scheduled for the following day, Thursday, August 15th.

5    The meeting concluded just as the parent was expressing concern

6  regarding Ethan's goals and objectives. The conversation was brought to a

7  premature end as the District insisted on enforcing the specific stop time of

8  the meeting.

9    First part of the second IEP meeting on Thursday, August 15th was spent

10  with a classroom demonstration by Ms. Kristjansson which used up a chunk of

11  time and was not part of the agenda. When the IEP Team did get started with

12  the IEP meeting we did not pick up with the agenda as we had left the

13  previous day, the discussion regarding goals & objectives was pushed to the

14  bottom of the agenda.

15    At the start of the meeting parent was handed a new draft of the IEP

16  ("2013 IEP Draft3") and the IEP Team started in with the discussion of two

17  areas of the PLAAFP that had been modified by the District: "Current

18  Classroom-Based Data" and "Communication". When parent had expressed concern

19  that parent had other questions in other areas regarding the PLAAFP that we,

20  the IEP Team, needed to discuss, parent was basically told that the IEP Team

21  were only discussing the District's specific changes and that everything had

22  been reviewed yesterday at the prior IEP Meeting.

23    Parent had significant notes that encompassed multiple documents,

24  because parent felt that there should be portions captured from the prior

25  IEP, things that should be eliminated from prior drafts and synopsis from

26  evaluations.

27    Given an example of a paragraph in the "Communication" section that had

28  been again copied over from the previous August 2012 version of the IEP and

1   had a single line that was redacted from it, the District basically had no

2   answer of why that specific line had been deleted. Again, SOCUSD spoke about

3   how the IEP was supposed to be a "new" IEP with "present levels", but had no

4   understanding of why some elements had been copied from prior IEP and why

5   some elements did not. It appeared that no one in the meeting was taking

6   accountability for the insertions or redactions; basically the District

7   represented the IEP as it was what it was, period.

8        Scott Keller had specifically stated at the August 15, 2013 IEP meeting

9   that himself as the P.A. (???) had "given" two hours yesterday and two hours

10  today. He expressed that he determined that the time he had assigned was

11  sufficient enough time to develop Ethan's IEP. So Mr. Keller, personally, had

12  prescribed the amount of time that was going to be for Ethan's IEP, even

13  though prior years had taken much longer. To the parent it appeared the IEP

14  was deliberately and intentionally time-boxed and the parental input was

15  minimized, if not eliminated, especially regarding the PLAAFP as there seem

16  to be no consideration to resolve any conflicts that the parent had. This is

17  a violation of IDEA under **34 C.F.R. § 322(a)** and **34 C.F.R. § 300.324(b)**.

18       Scott Keller was asked specifically by parent at the August 15, 2013

19  meeting regarding the possibility of another IEP meeting and the parent was

20  given the firm impression there would be no further opportunity for

21  discussion and that was that.

22       Again, parent had expressed that at the very least the "parental input"

23  from the previous annual IEP was to be included and parent would supplement

24  via email at the conclusion of the IEP meeting. The "parental input" from the

25  original prior annual IEP was still missing from the current draft of the IEP

26  as it was from the previous draft of the IEP.

27       The District constantly, repeatedly contradicted itself by claiming

28  that this was a "new" IEP, but there were so many elements that had been

brought over from the prior versions of IEPs. Again, when parent inquired why

some things had been copied over, the District replied that this was a

"draft" and those areas were open for discussion, but in reality they were

not. It would appear that as parent identified areas of the IEP that had just

been duplicated form prior IEP's and questioned why, the District basically

patronized us with "Ok…do you (parent) have any input?"

Then there were other areas of the IEP that had new information

intermingled with the changes which would require some reconciliation to

ensure accurate information. Parent had expected that all areas of the PLAAFP

had been completed not a smattering here and there, with modifications

contained within multiple IEP drafts.

Other sections of the IEP could have been simply carried over from the

prior years; such as the "*Accommodations*" and "*Service and Environment*",

which were specifically left open for discussion. There was greater time and

input encouraged on these sections by the other members of the IEP Team than

in other previous areas where one would have anticipated from prior years.

The hours in the "*Service and Environment*" section were basically left blank,

but in the end was basically the same they were the prior year.

As the meeting progressed it became clear that the parent needed to

discuss the goals, especially the need for the District to engage Ethan more,

was deliberately being pushed further and further back in the discussion;

until there only minutes left of the meeting, again eliminating the parental

input. Again, the District insisted that the end time of the meeting be

honored, basically eliminating any further discussion of the parent's

concerns regarding Ethan's goals and objectives.

As the August 15 IEP Meeting concluded Mr. Keller asked whether there

was consensus with the IEP and the parent chose to not respond either in the

affirmative or the negative, as it had become clear to the parent that
parental input had been purposefully and deliberately minimized.

Upset and frustrated, parent went home and after some research on IDEA
regulations had realized that under IDEA that there was a "stay put" measure,
which should have been automatically invoked by the District when we filed
Due Process Complaint in July, so parent chose to invoke that provision by
filing a MOTION TO STAY PUT with the Arizona Office of Administrative
Hearings that evening of August 15, 2013.

**Prior Written Notice**

Parent waited for the final version of the August 2013 IEP to be issued
by the school with the subsequent Prior Written Notice ("PWN"), fully
realizing that it was only until an IEP is issued, coupled with the PWN
recognizing it as such, could the parent dispute it. Parent received the
final version of the IEP and the subsequent PWN on Thursday, August 22, 2013.

The first thing parent noticed that the PWN had been back dated. In the
PWN the *Date Prior Written Notice Given to Parents*" was given as August 15,
2013, same day as he last IEP Meeting, although there had been mention in the
PWN of recognition of the parent filing the "stay put" measure as of August
16, 2013. Then parent viewed the final IEP, again the prior parental input
from the August 2012 IEP was not included as requested. Instead statements
were inserted in place of the parental input that would lead to one to
believe that the District was still awaiting something more from the parents.

Within the August 2013 IEP, the STO's relating to the goals and
objectives are written in such a way that does not allow the parent the
ability to track progress especially since some of the goals have STO's that
are completely independent of each other with no benchmarks attached to them.

1  This completely alleviates the schools responsibility to achieve any progress
2  except to document what progress that is made.

3      With the current goals and objectives, parent questions how anyone,
4  either parent or District, can ascertain whether the student has made
5  "expected" progress against the defined goals and objectives so that his
6  goals and objectives can be modified accordingly as per 34 C.F.R. §
7  300.324(b)(1)(ii)(A). As such parent believes the August 2013 IEP's current
8  goals and objectives do not meet the IDEA definition of either benchmarks or
9  STOs under **34 C.F.R. § 300.320(a)**, thus also in violation.

10     Also note in the PWN under the section "Description of each evaluation
11  procedure, test, record, or…" there is an entry regarding a report written by
12  Svany Svavarsdottir Kristjansson. Mrs. Kristjansson participated in both of
13  the IEP Meetings on August 14 and August 15, but there was no written report
14  that was provided for review before, during, or after the meeting. Her report
15  is being presented as something that was used as the basis for the
16  determination of his IEP, although the parent has not seen it, again in
17  violation of IDEA under **34 C.F.R. § 300.305(a)**.

18     In conclusion parent believes that the District deliberately and
19  intentionally attempted to minimize the parental participation and input,
20  prior to and including the August 14 and August 15 IEP Meetings, and as such
21  are not in agreement with the annum IEP that was indicated by the PWN issued
22  on Thursday, August 22, 2013.

23

24                              **STAY PUT**

25     According to C.F.R. § 300.518(a) parent institutes "stay put". As such,
26  since the current annual IEP, the August 2013 IEP, is the one brought into
27  question with this complaint, the previous annual IEP, the August 2012 IEP,
28  becomes the current educational placement.

## RESOLUTION

Parent would like to see another annual IEP created that would be an actual "new" creation that is not an amalgamation of multiple sources without any accountability by the District of why those specific pieces of sources were chosen over others. Parent would like there to be scheduled at least three two-hour meetings with a specific defined agenda, previously agreed to by the District and parent, which is followed in sequence. Parent would like there to be an independent third-party trained facilitator to assist with the IEP creation and the IEP meetings, to ensure that both the District's and the parent's concerns are equally considered and factored in the new IEP. Parent would like there be an actual MET review meeting encompassing all of Ethan's evaluations prior to the aforementioned scheduled IEP annum meetings. Parent would like to there to be an actual IEP Meeting to discuss Ethan's progress from both his August 2012 IEP, ESY, and the summer educational sessions dictated by prior resolution agreement prior to the aforementioned scheduled IEP annum meetings.

Parent believes that these resolution provisions are necessary to ensure that Ethan receives a Fair and Appropriate Public Education ("FAPE") as the District has apparently embarked on a retaliatory campaign to minimize, if not eliminate, parental input from Ethan's educational process.

RESPECTFULLY SUBMITTED this 3rd Day of September, 2013.

Respondent, Matthew C. Oskowis

By: _Matthew C Oskowis_

Matthew C. Oskowis (Pro Se)
105 Pony Soldier Road
Sedona, Arizona 86336

# Exhibit C



Matthew C. Oskowis (pro se)
105 Pony Soldier Road
Sedona, Arizona 86336
(602) 523-1863
Matthew.Oskowis@wellsfargo.com

Tuesday, November 26, 2013

**ARIZONA DEPARTMENT OF EDUCATION**

**OFFICE OF DISPUTE RESOLUTION**

<table>
<tr><td>)</td><td></td></tr>
<tr><td>)</td><td></td></tr>
<tr><td>)</td><td><b>DUE PROCESS COMPLAINT</b></td></tr>
<tr><td>)</td><td><b>NOTICE</b></td></tr>
<tr><td>)</td><td></td></tr>
<tr><td>)</td><td></td></tr>
<tr><td>)</td><td></td></tr>
</table>

This request is being initiated by the parent of Ethan Oskowis a nine-year old non-verbal autistic currently residing at the above address and attending West Sedona School ("WSS") in the Sedona Oak Creek Unified School District #9 ("District"), Sedona, Arizona.

This Due Process Complaint has no relationship, other than parties involved, with the prior Due Process Complaint **OAH No. 14C-DP-006-ADE** and **OAH No. 14C-DP-012-ADE** which was just heard in a hearing in front of the Arizona Office of Administrative Hearings ("Tribunal") last week (November 18-20, 2013).

This Due Process Complaint deals with issues specifically that the Tribunal ruled at last week's hearing as not included in prior complaints thus not heard during the hearing on their merits.

### BACKGROUND

Ethan Corbin Oskowis was diagnosed with classical infantile autism on March 23, 2006, shortly after his second birthday. To this day Ethan is non-verbal and uses augmented communication systems called PECS (Picture Exchange Communication System) to communicate his wants and needs.

Ethan has been a student of West Sedona School in the Sedona Oak Creek Unified School District since March 11, 2010. Ethan had arrived at West Sedona School with an already active IEP from his prior school, Chrysalis Academy of Tempe, Arizona, dated December 11, 2009. The IEP had twenty-one goals & objectives and called out specific methodologies (e.g. PECS, Discrete Trial Training, etc.) that had proven successful with Ethan at Chrysalis Academy.

At the conclusion of the 2009-2010 academic year and after not seeing reasonable progress against Ethan's goals & objectives stated in Ethan's December 2009 IEP, on July 19, 2010 parent requested mediation from Arizona Department of Education between himself and the District. On August 27, 2010 the first of two Mediation meetings was held at the District's offices. On September 27, 2010 the second of two Mediation meetings was held at the District's offices. During the second of two Mediation meetings an agreement was reached between the parent and the District and entered

into record with the Arizona Department of Education
under Mediation Reference #11-012.

At the conclusion of the 2010-2011 academic year
and again not seeing reasonable progress against
Ethan's goals & objectives stated in Ethan's December
2010 IEP, on or about September 26, 2011 the parent
again requested mediation from Arizona Department of
Education between themselves and the District.

On October 25, 2011 the mediation meeting was held
at the District's offices. During the meeting an
agreement was reached between the parent and the
District and entered into record with the Arizona
Department of Education under Mediation Reference #12-
15.

Before the October 2011 Mediation meeting District
produced Ethan's October 2011 progress report. This
report showed Ethan had made substantial progress
against all of his goals & objectives, whereas previous
progress reports in March 2011 and in May 2011 showed
only marginal progress against some of Ethan's goals &
objectives.

Included with the October 2011 progress report was
a collection of datasheets corresponding with not only
the October 2011 progress report but the previous
progress reports as well.

After careful analysis of the datasheets provided
by the District, certain discrepancies came evident
when comparing the actual datasheets of certain goals &

objectives to the claims of specific progress by the District in Ethan's October 2011 progress report. But even with the discrepancies, the data sheets showed Ethan had made substantial more progress in nearly two months (September and October, 2011) than he had in the prior fifteen months of academic service provided by the District.

Parent believes that the progress documented in the October 2011 IEP progress report was the result of the parent meeting with the District's Superintendent David Lykins at the start of August 2011. At the August meeting the parent demonstrated Ethan's ability to match/sort colors through a video; an ability which the District had previously reported through prior IEP progress reports that Ethan was unable to acquire. This demonstrated the student's capacity to learn, which had been in question prior to.

Thus parent believes that the District with the understanding that Ethan was capable, then strove to implement a more rigorous teaching methodology. The data sheets from September and October 2011 show that the majority of Ethan's goals & objectives were done daily with some being worked more than once per day. The majority of the instructional sessions that were done for the December 2010 IEP were within that September and October 2011 timeframe.

In the December 8, 2011 IEP Meeting the IEP Team with collaborative efforts and extensive parental

involvement finalized Ethan's 2011 IEP. Several meetings were utilized in the creation of the IEP with extensive discussion on the specifics of Ethan's goals & objectives and the participation of Ethan's principal evaluator, Andrew Gardner, Ph.D., BCBA-D.

The December 2011 IEP had seventeen goals & objectives, most of them are the evolution of Ethan's prior goals & objectives from his December 2010 IEP. As the school was able to show Ethan achieving rapid progress in the last few months of 2011 with his December 2010 IEP parent expected the school should be able to continue the momentum since the goals & objectives were not much different from his prior IEP.

Towards late January 2012, parent requested to review the data sheets and upon review noticed not only the data sheets had been changed in format, but the datasheets reflected not all the goals & objectives were being worked on. Upon parent inquiry parent was informed, due to the input of an outside consultant, Trina D. Spencer, Ph.D., BCBA, the decision was made certain goals & objectives were going to need to be changed. When parent expressed displeasure in not being informed previously of these changes to Ethan's IEP before they were implemented, District asked parent to meet with Trina D. Spencer to allow her to explain why she had made the changes.

Parent was also told by the District he had agreed to bringing on an outside consultant to "*provide*

*supervisory and oversight for SOCUSD*" and this is what
they had done. In actuality, there had been no formal
agreement, although it was expressed as a desire by the
parent for the District to employ an outside "expert"
during the IEP meetings utilized in the creation of the
December 2011 IEP. When the parent had inquired
directly whether or not the District would be employing
the services of an outside "expert" parent was never
given a definitive commitment, and it was not reflected
in any documentation. The only mention of an outside
"expert" was expressed in the December 2011 IEP in the
Parent Notes Section, which parent understood only
expresses the desires of the parents and is not
considered enforceable by either party.

Parent had a meeting with Dr. Trina D. Spencer on
February 16, 2012 and parent was explained first of all
Dr. Spencer did not understand some of the goals &
objectives, thereby she was unsure and/or unable to
implement them. As these were goals & objectives had
been created by the IEP Team over several meetings the
parent was a bit perplexed why there would be any
confusion. Parent also raised the concern of why the
parent had to raise the issue regarding the changes
first before parent was "brought-in-the-loop" as it
were.

The one individual who had been a participant and
the major contributor to the goals & objectives of both
Ethan's 2010 and 2011 IEP, Shannon J. Lund, a licensed

speech-language pathologist, could have easily cleared
up any confusion regarding his December 2011 IEP.
Unfortunately parent found out the District had
apparent difficulty in paying Shannon J. Lund's
invoices thereby she was subsequently unavailable to
provide the appropriate information. As she was the
only person who had been consistent over the recent
administration and staff turn-over, parent felt it
would be necessary for her to provide the insight into
Ethan's education program. Parent's repeated inquiries
to the lack of Shannon J. Lund attendance in meetings
and trainings was met with indifference.

At the IEP Meeting on February 24, 2012, Dr. Trina
D. Spencer expressed she would like to change Ethan's
goals from a "visual" to "receptive" based programming.
Again parent expressed our concern the District was not
working on the IEP as defined in December 2011, but was
working on a modified version according to what Trina
D. Spencer had defined.

On March 9, 2012 parent received Ethan's March 2012
Progress Report and there were several of his goals &
objectives which had the following verbiage
"*Instructional programs are developed for this goal but
formal instruction and data collection will be
implemented consistently in the forthcoming quarter.*"
This confirmed parent's worst fear; the District was
selectively implementing his IEP under the guise since
some of these goals & objectives were going to be

1  changed anyway there was no point in working on them.
2  This had been a repeated pattern whereas the District
3  had decided, because there needed to be changes to
4  Ethan's goals & objectives in his IEP, as a reason to
5  not implement the current goals & objectives as-is.
6      Parent filed a complaint with the Arizona
7  Department of Education, Complaint Reference #2317, on
8  April 4, 2012 and subsequently the ADE found the
9  District was in noncompliance for "*failure to implement*
10 *the IEP goals in a manner consistent with the Student's*
11 *December 8, 2011 or the District's own proposal that*
12 *the goals be implemented in January of 2012 is a clear*
13 *procedural violation of the IDEA regulations*"[1]. Although
14 the ADE did propose corrective action in the form of
15 in-service training, the ADE did not specifically
16 answer to the question of whether or not FAPE had been
17 denied.
18     At the May 24, 2012 IEP Meeting it was determined
19 by the IEP Team that it would create a new annum IEP
20 that would correspond with the beginning of the
21 academic year versus the calendar year. The IEP team
22 further agreed to coordinate over the summer to
23 minimize the meetings necessary to create and approve
24 the new annum IEP once school started in August 2012.
25     Ethan's annual IEP for the 2012-2013 academic year
26 was finally agreed to and signed on Monday, August 20,
27 2012 at a five hour IEP Meeting. The August 2012 IEP
28

[1] Arizona Department of Education Letter of Findings – Reference Number 2317,
p. 7

consisted of fifteen (15) goals & objectives and, again, most were an evolution from the prior IEP's goals & objectives. The District issued a Prior Written Notice dated Monday, August 27, 2012 that recognized the annual IEP and expressed the District's intention to implement.

The District was also participating in an IEP audit by the Arizona Department of Education and the parent had been indicated by both the ADE and the District that Ethan's August 2012 IEP would be audited as well. Knowing that the ADE would be reviewing the IEP would provide some indication that the IEP had been written and conformed to IDEA. Parent believed that the August 2012 IEP had passed the ADE scrutiny without any changes being recommended.

As the parent had been assured by the District that the past problems regarding Ethan's education (e.g. new teacher assigned, training for the new teacher, data management techniques, etc.) have been taken care, parent felt that Ethan education would be handled in an efficient and effective manner without the repeat of previous procedural issues from prior IEPs.

The August 2010 IEP Progress reports were produced for Ethan in October 2012, December 2012, March 2013, and May 2013. These are the primary indicator used by the parent to determine whether Ethan's progressing and whether the IEP goals & objectives and their implementation are effective.

After the March 2013 IEP Progress report, parent
requested through writing on March 20, 2013 an
information request specific to Ethan's data sheets
from January 2012 through to March 8, 2013 (the last
day of the reporting period reflected in the March 2013
IEP Progress report).

After careful analysis of the datasheets provided
by the District, certain major discrepancies came
evident when comparing the actual datasheets of certain
goals & objectives to the claims of specific progress
by the District in Ethan's October 2012, December 2012,
and March 2013 IEP Progress Reports.

The datasheets represented a significant lack of
consistency and implementation of Ethan's IEP for the
entire 2012-2013 academic year at WSS. The parent
requested Mediation from ADE on April 21, 2013 to
discuss his concerns and the District declined the
mediation request.

The discrepancies were brought to the attention of
the District briefly through written communication on
May 15, 2013 and were followed up on May 30, 2013 with
another written information request for the rest of the
datasheets for the year.

Upon receipt of the datasheets on Tuesday, June 4,
2013, combined with the May 2012 IEP Progress report,
further analysis was done and the District was
presented with the findings encompassing the entire
year through written communication on Sunday, June 9,

2013. The discrepancies in the datasheets became the basis for Due Process Complaint **OAH No. 14C-DP-006-ADE.**

In preparation for **OAH No. 14C-DP-006-ADE** parent also determined the amount of time spent on each implementation (i.e. instructional sessions) of each goal & objective and noted the calculated time fell short of the amount of educational services allocated in the August 2012 IEP.

## PROBLEM/COMPLAINT #1
## FAILURE TO PROVIDE SPECIAL EDUCATION SERVICES INDICATED BY THE IEP OF AUGUST 2012

The August 2012 IEP consists of fifteen (15) goals & objectives, which are consequently distributed across seven (7) special education service categories. The summation of the minutes per week across those special education service categories is twelve hundred (1200) minutes. During the August 2012 IEP, Ethan was attending school for 1500 minutes or 5 hours per school day.

As the August 2012 IEP specifically states for each goal & objective that "*data will be collected for each instructional session*"[2] and that the August 2012 IEP further states that "*data format will be utilized as determined by mediation agreement*"[3] (i.e. the comprehensive data sheet), that the comprehensive data

---

[2] *August 2012 IEP*, p. 16
[3] *Ibid.*, p.28

sheets used during the August 2012 IEP would reflect the bulk, if not all, of Ethan's instruction.

Utilizing the data sheets, cross referenced to the information provided by the District on the Daily Schedule Sheet and the paraprofessional's Goal Checklist Sheet collected daily, one can determine the number of trials worked per goal per day. Taking that Ethan's instruction is Applied Behavior Analysis ("ABA") utilizing Discrete Trial Training ("DTT") with an errorless trial approach, one can surmise that the average time for each trial can be estimated at twenty (20) seconds for each trial.

Taking the above information, the calculated average per week of time spent with instructional sessions is two hundred and five (205) minutes, considerably short of the 1200 minute mark. For arguments sake just by adjusting for 60 seconds versus 20 seconds for each trial, which would be excruciatingly long for even a child with autism, we multiply the current calculation by 2.5 and get five hundred and thirteen (513) minutes which is still less than half of the necessary special education service minutes per week allocated by the August 2012 IEP.

No other record has been offered by the District to effectively substantiate the additional time spent on Ethan's special educational services.

The August 2012 IEP also had in Ethan's Supplementary Services a Sensory Diet to be provided by

an Occupational Therapist for 200 minutes per week, this was not done by the Occupational Therapist on a regular basis, if at all. District records only account for the additional 120 minutes per month of Related Services for Occupational Therapy done by an Occupational Therapist and not for the Sensory Diet.

The 9th Circuit Court in *Van Duyn v. Baker School District 5J (2007)* admitted that "*most IDEA cases involve the formulation rather than implementation of an IEP*"[4]. The 9th Circuit goes on in *Van Duyn* to establish a standard of materiality in regards to the implementation of the IEP:

> "*In accordance with the IDEA itself, the Court's decision in Rowley and the decisions of our sister circuits, we hold that a material failure to implement an IEP violates the IDEA. …we clarify that the materiality standard does not require that the child suffer demonstrable educational harm in order to prevail.*"[5]

Also, in *Van Duyn* the 9th Circuit indicates that lack of education progress may indicate a failure to implement the IEP[6]. It is under this premise the parent presents the complaint.

---

[4] Van Duyn v. Baker School District, 5J 481 F.3d 770, 47 IDELR 182 (9th Cir. 4/3/2007) p. 3798
[5] Ibid., p. 3801
[6] Ibid.

"*The IDEA allows a party to challenge an IEP because of procedural flaws in the IEP's formulation as well as "on substantive grounds based on a determination of whether the child received a free appropriate public education" 20 U.S.C. § 1415(f)(3)(E)(i). This language surely indicates that a failure to implement an IEP may deny a child a free appropriate public education and thereby give rise to claim under statute.*"[7]

It is the parent's intention to present both datasheets and very simple data analysis in its assertion that the District failed to substantially provide special education services indicated in the August 2012 IEP and that this is a material failure under *Van Duyn*, and subsequently results in a denial of FAPE.

As the District has repeatedly emphasized through prior communications Ethan has progressed, that is not the issue here. Parent does not question whether Ethan has progressed or not, nor does parent seek a specific rate of progress. The parent is fully aware that specific rates of progress of the student cannot be guaranteed, but parent does believe that it should have certain performance expectations of the District.

---

[7] Ibid., p. 3799

The issue the parent has is that Ethan was not given the "opportunity" to progress because of the lack of special education services provided in accordance of the August 2012 IEP. By not providing the necessary amount of special educational services in the implementing the goals & objectives according to the IEP led to the loss of the "opportunity" for Ethan to progress accordingly.

The parent is only seeking from the District to be held responsible only what they have previously agreed to through the August 2012 IEP. As the District will surely present the multitude of meetings with parents, hundreds of data sheets collected, and the myriad of communications; volume does not necessarily indicate quality or substance.

A deprivation of educational benefit under 20 U.S.C. § 1415(f)(3)(E)(III) looks to whether the District's conduct has actually caused a deprivation of educational benefit to which Ethan was entitled under the IEP; its language is not directed to whether the IEP is reasonably calculated to lead to educational benefit. A violation of this obligation thus occurs when the school district fails in its procedural obligation to implement the IEP that the IEP team has collaboratively determined to be appropriately and individually calculated to provide educational benefit.

## PROPOSED RESOLUTION #1a

Considering the lack of "opportunity" for progression provided to Ethan by the District, indicated by the datasheets, the parent is seeking compensatory hours for missed educational opportunity in the sum of three hundred and fifty (350) hours.

This was calculated based on the 39 weeks associated with August 2012 IEP, minus the four weeks for Fall, Winter and Spring breaks, leaving 35 weeks total. Taking into consideration that on a weekly basis that over half of the educational service hours are not accounted for we will take 600 minutes a week of lost opportunity. Parent reserves the right to increase this estimate as information is acquired, assessed and presented at the Due Process Hearing.

If we consider Ethan's recent independent evaluation done by a licensed clinical psychologist, Joseph A. Gentry, Ph.D., BCBA-D, and his recommendation of three hours of intensive level of servicing per day we can adjust the number accordingly. This would be 35 weeks x 15 hours of service per week resulting in 525 hours and taking half, since the maximum minutes recorded in a week was still less than half of that, results in 263 compensatory education hours.

If the parent was to take on solely this amount of hours it would cost the parent, based on the current state-accepted rate for private rehabilitation services

of $17.55 an hour, over four thousand five hundred dollars ($4,615.65).

The District has asserted previously that IEP's are not to be judged in hindsight, parent agrees with the assertion, although a student's actual progress may be used to show that an IEP was or was not appropriate. Moreover, an IEP that provides appropriate services for some but not all of the student's identified disabilities may still subject an LEA to liability for compensatory education[8].

The District asserts that IEP's are not to be judged in hindsight, but then defends its actions claiming that IEP goals were not implemented because they were determined unclear or immeasurable. Parent does not believe the IEP team in August 2012 would have knowingly created goals that were unclear or immeasurable at the time of the IEP creation, so why would the District rely on hindsight of those goals as a defense? The District cannot have it both ways.

The District has also asserted that a procedural violation is not a denial of FAPE and is supported by present case law, the parent concurs. A **single** (emphasis added) procedural violation is not denial of FAPE, but multiple, repetitive procedural violations can be construed as a material failure to implement the IEP and subsequently a denial of FAPE[9].

---

[8] D.H. and D.H. ex rel. J.H. v. Manheim Township School LEA, No. 05-1113, F. Supp. 2d(E.D. Pa. 2006, 45 IDELR 38.
[9] Ibid. 2, p. 3788

### PROPOSED RESOLUTION #1b

The parent is also seeks 117 compensatory hours of Occupational Therapy for the Sensory Diet that was to be performed by the Occupational Therapist for 200 minutes per week according to the August 2012 IEP. Parent can only surmise the District determined that the Sensory Diet could be delivered by Ethan's paraprofessional and did not make the appropriate change to Ethan's IEP.

Taking the amount of special education service minutes per week in combination with the 200 minutes for Ethan's sensory diet results in 1400 minutes of total service per week, which is significant when Ethan's total time at school was only 1500 minutes per week.

### PROPOSED RESOLUTION #1b

As the District seems incapable of appropriately managing and implementing its own educational program regarding Ethan's IEP, we would also like the assignment of a recognized independent, third-party to provide supervisory and oversight of Ethan's educational program on a continual basis until such time that the District can provide evidence of the capability to manage Ethan's IEP on their own.

This request is supported by Porter v. Board of Trustees of Manhattan Beach Unified School District[10].

[10] Porter v. Board of Trustees of Manhattan Beach Unified Sch'l Dist., et al. Case No. CV 00-08402 GAF (USDC, C.D. Cal. 2005)

In Porter, a separate order of interim relief was granted by the presiding judge that transferred control of the student's education from the Manhattan Beach USD and the California Department of Education to a Special Master, an independent third party.

## CONCLUSION

Parent feels that the District has failed to substantially deliver the special education services indicated by the August 2012 IEP. Parent feels that the District failed to provide a Sensory Diet delivered specifically by the Occupational Therapist in accordance to the August 2012 IEP. Parent feels that the District, through its actions, has denied Ethan a fair and appropriate public education by not honoring the said specifics in the August 2012 IEP.

**Respectfully Submitted** this 26th day of November, 2013.

Parent/Advocate, Matthew C. Oskowis

By: _____

Matthew C. Oskowis
105 Pony Soldier Road
Sedona, Arizona 86336

## Synopsis of Supporting Documents

"**August 2012 IEP**" – This is an annotated version of the August 2012 IEP that was recognized by the District via PWN on August 27, 2012.

"**Trials by Goals by Day**" – these five sheets show a day-by-day breakdown of the number of trials spent on each goal based on the number of trials recorded in the comprehensive data sheets for that day. This was created by entering each of the comprehensive data sheets into a database and counting the number of trials entered into the data sheets for each day programmatically.

"**Times by Goals by Day**" – these five sheets show a day-by-day breakdown of the time spent on each goal based on the number of trials recorded in the comprehensive data sheets for that day in seconds with totals and average in minutes.

"**Times by Goal by Week**" – these two sheets show a week-by-week breakdown of the time spent on each goal based on the number of trials recorded in the comprehensive data sheets for that week in seconds with totals and average in minutes.

"**Times by Services by Week**" – these two sheets show a week-by-week breakdown of time spent on each special education service category defined by the August 2012 IEP in minutes.

Note regarding Accuracy – considering that there was three thousand plus (3080) instructional sessions recorded in the comprehensive data sheets, the impact of even a couple of the data sheets missing from the overall data set is minimal. There are five (5) instructional sessions per data sheets, so there could be eighteen (18) complete data sheets missing and it would result in only in a 3% error rate.

////

**Sedona Oak-Creek Unified School District**
**Special Education Department**

# Individualized Education Program (IEP)

Student Name: Oskowis, Ethan Corbin
Student ID: 704332

Student Data/Cover Sheet (Form A-1)

IEP Meeting Date: 8/20/2012
DOB: 2/12/2004

| Demographic Information | | | | | |
|---|---|---|---|---|---|

| **Student Number:** 704332 | **Student Name:** Oskowis, Ethan Corbin | | **Birthdate:** 2/12/2004 | **Gender:** Male | **Grade:** 3 | |

| **Student Address:** 105 Pony Soldier Rd. | **Home Phone:** 554-4353 |
|---|---|
| **City, State, Zip:** Sedona, AZ 86336 | |
| **Parent 1 Name:** Middlebrook, Tara | **Parent 1 Relationship:** Mother |
| **Parent 1 Address:** | **Home Phone:** 554-4353 |
| **City, State, Zip:** | **Work Phone:** |
| **Parent 1 Email:** | **Cell Phone:** (928) 274-3156 |
| **Parent 2 Name:** Oskowis, Matthew | **Parent 2 Relationship:** Father |
| **Parent 2 Address:** | **Home Phone:** (602) 903-0743 |
| **City, State, Zip:** | **Work Phone:** (602) 523-1863 |
| **Parent 2 Email:** | **Cell Phone:** |

| **Primary Language of Home:** English | **Primary Language Survey Date:** **Primary Language Survey Results:** | **Language of Instruction:** English |
|---|---|---|
| **Home District:** Sedona-Oak Creek Unified **Attendance District:** Sedona-Oak Creek Unified | **Service Coordinator:** Baumgartner, Ken | |
| **Home School:** West Sedona School | **Attending School:** West Sedona School | |

| **Vision Screened On:** 9/20/2011 | **Results:** Passed | **Hearing Screened On:** 11/24/2011 | **Results:** Passed |
|---|---|---|---|
| **Meeting Date:** 8/20/2012 | **Anticipated Duration of IEP:** 8/21/2012 **To** 8/20/2013 | **Re-evaluation Due:** 8/22/2014 **Current Evaluation:** 8/22/2011 | |

| **Special Education Primary Category #1:** Autism |
|---|
| **Special Education Eligibility Category #2:** Mild Intellectual Disability |
| **Special Education Eligibility Category #3:** Speech/Language Impairment |
| **Level of Service:  (C)** Inside General Class less than 40% of the day. |
| **Type of Meeting:**  ANNUAL |

| **Date Meeting Notice Sent to the Parent(s):** 8/10/2012 | **Date Procedural Safeguards given to the Parent(s):** 8/20/2012 | |
|---|---|---|

**Sedona Oak-Creek Unified School District**
**Special Education Department**

# Individualized Education Program (IEP)

| | | |
|---|---|---|
| Student Name: Oskowis, Ethan Corbin | Cover Sheet Signature Section (Form A-2) | IEP Meeting Date: 8/20/2012 |
| Student ID: 704332 | | DOB: 2/12/2004 |

The following persons **participated** in this conference and/or the development of the IEP. Additionally, parents have been given a copy of their rights regarding the student's placement in special education and understand that they have the right to request a review of their child's IEP at any time.

| Position/Relation to Student | Participant | Date (MM/DD/YY) |
|---|---|---|
| Parent | | |
| Special Education Teacher | | |
| General Education Teacher | | |
| District Rep/designee | | |
| BCBA | | |
| Parent | | |
| Principal | | |
| Occupational Therapist | | |
| Physical Therapist | | |
| Speech Language Pathologist | | |
| Education and Communication Consultant | | |
| School Psychologist | | |

*\* If during the IEP year the student turns 16, if the student is not present at the IEP meeting, the service coordinator must review the IEP with the student and obtain the student's signature and the date of this review.*

**Sedona Oak-Creek Unified School District**
**Special Education Department**

## Individualized Education Program (IEP)

| | | |
|---|---|---|
| Student Name: Oskowis, Ethan Corbin<br>Student ID: 704332 | Present Level of Academic Achievement and<br>Functional Performance (Form B) | IEP Meeting Date: 8/20/2012<br>DOB: 2/12/2004 |

### PRESENT LEVEL OF ACADEMIC ACHIEVEMENT AND FUNCTIONAL PERFORMANCE

#### Section 1:  Current IEP Information

**Goal Number Written:** 17          **Goal Number Met:** 0

**Summarize special education services the student is receiving:**

Ethan is an 8-year old third grader attending West Sedona School. He has a diagnosis of Autism and does not exhibit vocal speech. He receives special education services in the self-contained setting for most of his school day. He participates in group activities for portions of related service provider therapy sessions (OT and Speech). He also participates in recess with this peer group. Lunch is spent with special education peers and staff in the cafeteria during the regular lunch period.

Ethan receives related services of occupational therapy, speech therapy and physical therapy. Academic and functional skills are taught in the self-contained setting. Besides occupational therapy, speech therapy and physical therapy, Ethan is receiving an individualized curriculum to help build his social-emotional, language arts, math and daily living skills. He attends school from 9 am to 2 pm, utilizes curb-to-curb transportation and has a full-time aide. He receives additional services from the teacher and other aides in either a one-to-one or small-group setting. Ethan uses a picture schedule to transition from one activity to another, using photo icons. In addition, he has a PECS (Picture Exchange Communication System) book that contains photo icons.

#### Section 2:  Evaluation Information

Ethan is generally an enthusiastic participant in all areas of his educational environment. He is willing to attempt a variety of familiar and unfamiliar activities. Ethan responds to visual cues in the form of photo icons to follow a visual schedule. He responds to actual photographs of himself in a particular setting or activity, as well as photos of familiar environments without him in the picture. He also responds to photos of items involved in an activity (i.e. his lunchbox photo is a cue to go to the cafeteria, his backpack photo is a cue to start getting ready to go home). He consistently responds to only 3 oral directions at school (come here, stand up, sit down), when presented solely as oral directions or in combination with gestures. In addition responding to visual prompts and cues, Ethan responds to other prompts such as eye contact or partial physical prompting (such as holding a hand, gently taking an arm or placing a hand on his shoulder). With these combinations of cues and prompts, Ethan successfully travels to his other classrooms, the recess area and the cafeteria.

When Ethan protests or cries, it is usually due to being tired or not wanting to do the work that is asked of him. With reinforcers, frequent breaks, and an appropriate ratio of new/more challenging tasks to low frustration tasks, Ethan will remain engaged in his daily academics without protest.

Ethan often makes eye contact with adults, sometimes makes eye contact with peers, and will sometimes reach out to explore the face of another adult. He is amiable to his peers and allows them to approach and greet him, but he seldom reciprocates an interaction. He does laugh and gets excited to see his peers playing. He tolerates a peer holding his hand and making eye contact.

Ethan can use a fork and spoon to eat many of his foods. He continues to show interest in 3-dimensional cause and effect toys. In addition, he shows great interest in a chunky shapes and Toy Story puzzle. He enjoys completing the puzzles, repeatedly, by himself. He also shows great interest in objects he can squeeze and watch slowly regain their original shape. Ethan shows functional problem-solving skills in the classroom when he uses photo icons to request what he wants. He has recently begun asking for help using a clip-art icon. He has shown progress in matching shapes, colors and objects.

Ethan requires the use of an AAC communication system to assist with functional communication. Ethan currently uses the Picture Exchange Communication System (PECS) as his AAC system. He is currently in Phase 4a of PECS, attaching a photo or icon to a sentence strip with an "I want" icon affixed to the lefthand side and bringing it to a communication partner.

Ethan needs visual supports and teaching strategies to access his educational environment. Emphasis should be placed on building off of Ethan's visual strengths.

Teaching of receptive and expressive communication skills should focus on what Ethan needs, as opposed to compliance with requests from adults.

Ethan responds well to many methodologies within Applied Behavior Analysis. Special education teacher notes that reinforcement, pairing, prompt fading, shaping, chaining, and task analysis have played a very significant role in Ethan's progress.

Ethan needs a consistent routine of instruction with strategies that are consistently implemented by his instructors. He needs daily access to familiar communication partners.

Ethan continues to need practice in the areas of functional, life-based skills (i.e. hygiene, dressing, dining). Ethan also needs instruction to develop response repertoires to receptive commands, and to develop imitation skills. Further analysis of verbal behavior skills that need to be addressed are outlined in the VB-MAPP.

SUMMARY OF VB-MAPP ASSESSMENT (Ken Baumgartner, Yolanda Edgerly and Dr. Trina Spencer, May 2012):

Ethan's established strengths are as follows:

- Visual perceptual/matching-to-sample
- Independent play
- Mands

Emerging strengths for Ethan are as follows:

- Social behavior & play
- Motor imitation
- Spontaneous vocalizations
- Listener responding skills

Ethan is not demonstrating tact or echoic skills at this time.

Ethan has strong Independent Play and Mand skills. With regard to Social Behavior and Play, Ethan orients toward other peers but does not independently initiate, imitate or reciprocate social behavior. Ethan's motor imitation is very limited. He can imitate 2 motor actions with at least 2 different people when provided with strong reinforcers that are immediate and tangible or edible. He requires heavy prompting initially for this.

Ethan responds to verbal stimuli but with varying degrees depending on if he is involved in a play activity and the level of familiarity of the attending adult. When engaged in independent play Ethan only consistently responds to the paraprofessional with whom he is most familiar.

Barriers categorized as persistent problems for Ethan were:

- Imitation
- Listener Repertoires
- Prompt Dependency
- Conditional Discrimination (CDs)
- Response Requirement Weakens MO
- Reinforcement Dependency

Barriers categorized as severe problems for Ethan were:

- Echoic Repertoire
- Social Skills
- Generalization
- Weak Motivators
- Articulation

Early Echoic Skills Assessment (EESA):

Ethan was given the Early Echoic Skills Assessment (EESA) over 2 sessions due to Ethan's limited attention to task and tendency to become frustrated easily. Established reinforcers were used to maintain his attention and encourage responses. Ethan was given breaks when he appeared frustrated and instructions were limited to "say ____". The request was repeated if there was no response. Throughout testing Ethan appeared somewhat confused by the request. He would often either point to the reinforcer or point/touch the examiner's mouth/face in response to a direction.

Group 1: Simple reduplicated syllables (targets: vowels, diphthongs, consonants p, b, m, n, h, w)
-Ethan received an overall assessment score of 0. He appeared somewhat confused by the request, consistently pointing to the reinforcer (in sight) or to this examiner's mouth. On one occasion he vocalized "ooh ooh" but this did not appear to be in response to the examiner's request.

Group 2: Syllable combinations (targets: add consonants k, g, t, d, f, y, ng)
-Ethan scored an overall assessment score of 0 on this portion of the test. He had several instances of verbalizations, however these "responses" did not appear to be in response to the examiner's request. Noted verbalizations included: "mmm", "eh uh", "ooo" and "nnn". During these times of verbalizations he was often looking at this fingers/hands or looking in another direction.

Group 3: 3 syllable combinations
-Ethan received an overall assessment score of 0 of this portion of the test. He did not exhibit any verbalizations for this subtest.

Group 4: Prosody: other contexts.

Ethan received an overall assessment score of 0 on this portion of the test. He did not provide any responses to items delivered.

Group 5: Prosody and other contexts
Ethan received an overall assessment score of 0 on this portion of the test. He did not provide any responses to any item delivered.

Summary/Recommendations:

Echoic skills are not a strength for Ethan. He does not appear to understand the instructions and demonstrates high levels of frustration when he responds in a manner that he is used to (point mand for reinforcer) and is not instantly given item. At this time Ethan is not exhibiting strong imitation, receptive language skills or a strong motivational drive for verbalizing, all of which are needed to work on verbal expressive skills (i.e. articulation, syntax, etc,). It is recommended Ethan continue to work on and refine his functional communication skills through use of an appropriate AAC device (i.e. PECS) so that he may have his wants/needs met on a daily basis with different communication partners in different academic settings. As Ethan continues to grow and progress in his overall communication skills, if he begins to exhibit stronger verbal imitation drive, this area should be reassessed.

General IEP Considerations/Recommendations:

Ethan is doing well in many aspects of academic and functional skills. He has shown an ability to acquire functional communication through PECS and increase his manding repertoire. Ethan can respond to verbal instructions in multiple settings with different adults. It is also encouraging that Ethan shows interest in social and group activities and that he makes eye contact. Ethan's visual discrimination abilities allow him to readily participate in many academic tasks, follow a visual schedule, maintain interest in activities such as books and puzzles, and quickly acquire the use of technology such as the computer and iPad.

VB-MAPP and progress data are important to consider in the development of IEP components such as goals and present levels of performance. Educational considerations and recommendations are as follows:

- Listener Responding and Motor Imitation are areas that will need immediate and intensive interventions in order for Ethan to acquire new academic and functional skills.

- There are current challenges with regard to receptive object identification goals and programs. VB-MAPP assessment data indicate that the barrier of Conditional Discrimination is a major contributing factor to progress with IEP goals 1 and 4. These require Ethan to simultaneously: 1) follow a receptive command ("point to"), 2) perform a conditional discrimination task between pointing as a mand function vs. as a response to a receptive command and 3) acquire receptive identification of shapes and colors. For this reason it is recommended that the goal and/or instructional strategies be refined.

- Continuation through all PECS phases will ensure Ethan further develops in this area, as well as acquires tact functions.

- Learner strain is becoming a factor in Ethan's progress. Factors affecting learner strain should be considered. Time must be allowed during implementation of instructional programs for frequent opportunities to mand for breaks and/or reinforcers. Transition time between activities must be considered as well.

------------

December 2011:
SUMMARY OF DR. GARDNER'S ASSESSMENT (8/15/2011):

The standardized testing by Dr. Gardner included the following results:

Vineland Adaptive Behavior Scale II – all adaptive behavior subdomains were scored in the "low" range across home and school settings.

Cognitive measures (UNIT & Stanford-Binet Intelligence Scales 5 non-verbal battery) – Ethan's overall cognitive abilities, as demonstrated on the UNIT, fall within the Very Delayed range, as indicated by his Full Scale IQ score of 47. Consistent with the scores on the UNIT, Ethan received a Nonverbal IQ score of 42, which suggests overall nonverbal reasoning skills within the Moderately Impaired or Delayed range. The results of the UNIT and SBV are similar and suggest very delayed cognitive abilities. Due to the nature of the tasks and Ethan's understanding of the directions, the results from the SBV are believed to be the most accurate representation of his current cognitive skills.

BASC-II – Ethan's scores suggests that he does not experience more feelings of anxiety, depression, or somatization than do his same-aged peers. Both raters indicated high levels of other behavioral challenges that are typical of children with autism. The Adaptive Skills composite provided information regarding Ethan's ability to care for himself, socialize with peers, his level of communication, and his study skills. The scores obtained by both raters suggested overall adaptive skills within the Clinically Significant range and corroborates the information obtained on the Vineland-II.

SSIS - Ethan's ratings by his mother and care provider on the SSIS were quite consistent with school observations and other reports. His scores were low and significantly below the social skill scores of peers his own age.

The ABLLS-R was also administered to Ethan in order to obtain baseline data, measuring the functioning level of multiple skill areas that impact language, daily living, and many others. All available scales were chosen for this assessment in order to use the scales as a progress monitoring tool throughout the school year.