WO

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Matthew Oskowis, | No. CV-14-08166-PCT-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| Sedona Oak-Creek Unified School District #9, | |
| Defendant. | |

Pending before the Court is Plaintiff Matthew Oskowis ("Plaintiff")'s administrative appeal of an impartial due process decision brought pursuant to the Individuals with Disabilities Education Act ("IDEA"). Plaintiff contends that Administrative Law Judge Tammy L. Eigenheer ("ALJ") erred in her decision regarding four due process complaints filed by Plaintiff on behalf of his son E.O. ("Student"). The Court now rules on Plaintiff's appeal.

I.     **Background**

    A.     **Factual Background**

A comprehensive factual background of this case is set forth in the ALJ's decision. (IRR 260).[1] Only those facts relevant to the issues raised in Plaintiff's Opening Brief (Doc. 32) will be presented here.

Plaintiff is the father of Student, a ten year old boy at the time Plaintiff filed this

---

[1] Citations to "IRR" are to document numbers listed in the Index of Record on Review filed at Docket 19.

appeal in September 2014. (Doc. 1 at 8). Student was diagnosed with classical infantile autism on March 23, 2006, is non-verbal, and relies on an augmented communications system called Picture Exchange Communication System ("PECS") to demonstrate his wants and needs. (*Id.*)

The parties do not dispute Student's eligibility for special education and related services under the IDEA. Since March 11, 2010, Student has attended and received these services at West Sedona School in the Sedona Oak-Creak Unified School District #9 ("District") located in Sedona, Arizona. (IRR 260 at 4). As mandated by the IDEA, Student's Individualized Education Program ("IEP") Team conducted annual meetings to craft Student's IEP[2] for the following year. (*Id.* at 5). Through the course of two meetings in August 2012, Student's IEP Team developed Student's IEP for the 2012–2013 academic year ("August 2012 IEP"). (*Id.*) This lawsuit calls into question District's implementation of the August 2012 IEP. *See* (Doc. 32).

The August 2012 IEP set forth fifteen annual goals and three short-term objectives ("STOs") for each goal. (IRR 192 at 16–24). Practically speaking, STOs are interim steps that a student will attempt and attain before undertaking a full-fledged goal. After multiple amendments,[3] the August 2012 IEP's goals and STOs read as follows:

> Goal 1 – Student will match 8 color words (red, blue, green, yellow, orange, purple, brown, black) in black type with a corresponding color swatch in a field of 8, with 80% accuracy across 3 consecutive instructional sessions as measured using a trial-by-trial data sheet. Data will be collected for each instructional session.
>
> STO 1: By 10/12/2012, Student will match 8 color words printed in the corresponding color, to an identical color word printed in the corresponding color, out of a field of 8 with 80% accuracy across 3 consecutive instructional sessions.
>
> STO 2: By 12/21/2012, Student will match 8 color words printed in the

---

[2] In essence, an IEP is a yearly academic roadmap that a school district must create and implement for qualifying students.

[3] The IEP Team amended the August 2012 IEP nine times throughout the 2012–2013 academic year. *See* (IRR 260 at 5).

corresponding color to corresponding color swatches, out of field of 8 with 80% accuracy across 3 consecutive instructional sessions.

STO 3: By 3/8/2013, Student will match 8 color words in the corresponding color to corresponding color words in black type, out of field of 8 with 80% accuracy across 3 consecutive instructional sessions.

Goal 2 - Given 6 photos of familiar people (E.g. Traci, Mary, Ken, Nancy, and two peers) in an array of 6, Student will match the correct photo to the corresponding printed word with 80% accuracy across 3 consecutive instructional sessions, using a trial by trial data sheet. Data will be collected for each instructional session.

STO 1: By 10/12/2012, Given 2 photos of familiar people (e.g. Traci, Mary) in array of six, Student will match the correct photo to a photo with the corresponding printed word, with 80% accuracy over 3 consecutive instructional sessions.

STO 2: By 12/21/2012, Given 2 photos of familiar people (e.g. Traci, Mary) in array of six, Student will match the correct photo to the corresponding printed word with 80% accuracy over 3 consecutive instructional sessions. Given 2 additional photos of familiar people (e.g. Ken, Nancy) in an array of six, Student will match the correct photo to a photo with the corresponding printed word, with 80% accuracy over 3 consecutive sessions.

STO 3: By 3/8/2013, Given 4 photos of familiar people (e.g. Traci, Mary, Ken, Nancy) in array of six, Student will match the correct photo to the corresponding printed word with 80% accuracy over 3 consecutive instructional sessions. Given 2 additional photos of familiar people (two familiar peers) in array of six, Student will match the correct photo to the corresponding photo with the printed word, with 80% accuracy over 3 consecutive instructional sessions.

Goal 3 - Student will match 10 shapes (circle, square, triangle, star, diamond, hexagon, octagon, rectangle, heart, oval) in an array of 3, with 80% accuracy across 3 consecutive instructional sessions, recorded using a trial-by-trial data sheet. Data will be collected for each instructional session.

STO 1: By 10/12/2012, Student will match 4 shapes (circle, square, triangle, star) in an array of 3, with 80% accuracy across 3 consecutive instructional sessions.

STO 2: By 12/21/2012, Student will match 6 shapes (circle, square, triangle, star, diamond, hexagon) in an array of 3, with 80% accuracy across 3 consecutive instructional sessions.

STO 3: By 3/8/2013, Student will match 8 shapes (circle, square, triangle, star, diamond, hexagon, octagon, rectangle) in an array of 3, with 80% accuracy across 3 consecutive instructional sessions.

Goal 4 - When provided with set up Student will independently brush all surfaces of his teeth with 100% accuracy across 3 consecutive instructional sessions. He will be evaluated using duration recording. Data will be collected for each instructional session.

STO 1: When provided with set up Student will allow staff to put the toothbrush on all surfaces of his teeth with 100% accuracy across 3 consecutive instructional sessions.

STO 2: When provided with set up Student will allow staff to provide full physical prompts and put the toothbrush on all surfaces of his teeth with 100% accuracy across 3 consecutive instructional sessions.

STO 3: When provided with set up Student will allow staff to provide partial physical prompts and put the toothbrush on all surfaces of his teeth with 100% accuracy across 3 consecutive sessions.

Goal 5 - Given the classroom computer, Student will independently open 2 different web browsers in 2 different locations and click on the bookmark to a desired website in more than one location, with 80% accuracy across 3 consecutive instructional sessions, recorded using a task analysis data sheet. Data will be collected for each instructional session.

STO 1: By 10/12/2012, Given the classroom computer, Student will open a web browser in 2 different locations on the screen with 80% accuracy across 3 consecutive instructional sessions.

STO 2: By 12/21/2012, Given the classroom computer, Student will open a web browser in 2 different locations on the screen and access a desired bookmark in more than one location with 80% accuracy across 3 consecutive instructional sessions.

STO 3: By 3/8/2013, Given the classroom computer, Student will open a web browser and access a desired bookmark in more than one location with 80% accuracy across 3 consecutive instructional sessions.

Goal 6 - Student will develop his social interaction/communication skills by participating in a reciprocal turn-taking activity of up to 3 exchanges on 3/5 opportunities over 2 days with decreasing physical cues (full prompting, partial prompting, visual supports only) as measured by trial-by-trial data collection. Data will be collected for each instructional session.

STO 1: By 10/12/2012, Student will participate in a turn taking activity with an adult for 3 exchanges with full physical prompting on 5/5[] opportunities.

- 4 -

STO 2: By 12/21/2012, Student will participate in a turn taking activity with another peer for 2 exchanges with partial physical prompting on 5/5 opportunities.

STO 3: By 3/8/2013, [Student] will participate in a turn taking activity with another peer for 3 exchanges with partial prompting on 3/5 opportunities.

Goal 7:  Given his PECS book, Student will move the "I want" picture to the left side of the sentence strip and remove the reinforcer picture from the communication book and place it on the sentence strip, hand it to his communication partner and point to each icon in the correct order, for 12 new vocabulary words, with 80% accuracy across 3 consecutive instructional sessions as measured using trial-by-trial data sheets during each instructional session. Data will be collected using SLP made assessments, a minimum of 1 time per week by SLP.

STO 1: By 10/12/2012, Student will request 6 new vocabulary words by moving the "I want" picture to the left side of the sentence strip and removing the reinforcer picture from the communication book and placing it on the sentence strip, handing it to his communication partner and pointing to each icon in the correct order, with 80% accuracy across 3 consecutive instructional sessions.

STO 2: By 12/21/2012, Student will request 9 new vocabulary words by moving the "I want" picture to the left side of the sentence strip and removing the reinforcer picture from the communication book and placing it on the sentence strip, handing it to his communication partner and pointing to each icon in the correct order, with 80% accuracy across 3 consecutive instructional sessions.

STO 3: By 3/8/2013, Student will request 12 new vocabulary words by moving the "I want" picture to the left side of the sentence strip and removing the reinforcer picture from the communication book and placing it on the sentence strip, handing it to his communication partner and pointing to each icon in the correct order, with 80% accuracy across 3 consecutive instructional sessions.

Goal 8 - Given photos of six 3-step actions, Student will complete the action described with 100% accuracy across 3 consecutive sessions, recorded using a trial-by-trial data sheet. Data will be collected for each instructional session.

STO 1: By 10/12/2012, Given photos of two 3-step actions and partial physical prompting, Student will complete the action described with 100% accuracy across 3 consecutive instructional sessions.

STO 2: By 12/21/2012, Given photos of two 3-step actions, Student will

complete the action described with 100% accuracy across 3 consecutive instructional sessions.

STO 3: By 3/8/2013, Given photos of four 3-step actions, Student will complete the action described with 100% accuracy across 3 consecutive instructional sessions.

Goal 9 - Given 13 objects (e.g. cow, horse, dog, duck, cat, car, truck, school bus, fire truck, motorcycle, jeep, ambulance, police car) and mats or story boards representing 2 categories (animals and vehicles), Student will sort objects into the appropriate categories with 80% accuracy across 3 consecutive instructional sessions, recorded using a trial by trial data sheet. Data will be collected for each instructional session.

STO 1: By 10/12/2012, Given 5 objects (e.g. cow, horse, car, truck, school bus), mats or story boards representing 2 categories (animals and vehicles) and gestural prompts, Student will sort objects into the appropriate categories 4 out of 5 trials on 3 consecutive instructional sessions.

STO 2: By 12/21/2012, Given 5 objects (e.g. cow, horse, car, truck, school bus) and mats or story boards representing 2 categories (animals and vehicles), Student will sort objects into the appropriate categories 4 out of 5 trials on 3 consecutive instructional sessions. Given 10 objects (e.g. cow, horse, dog, duck, car, truck, school bus, fire truck, motorcycle, jeep), mats or story boards representing 2 categories (animals and vehicles), and gestural prompts, Student will sort objects into the appropriate categories 4 out of 5 trials on 3 consecutive instructional sessions.

STO 3: By 3/8/2013, Given 10 objects (e.g. cow, horse, dog, duck, car, truck, school bus, fire truck, motorcycle, jeep), and mats or storyboards representing 2 categories (animals and vehicles), Student will sort objects into the appropriate categories 4 out of 5 trials on 3 consecutive instructional sessions. By 3/8/2013, Given 13 objects (e.g., cow, horse, dog, duck, cat, car, truck, school bus, fire truck, motorcycle, jeep, ambulance, police car), mats or story boards representing 2 categories (animals and vehicles), and gestural prompts, Student will sort objects into the appropriate categories 4 out of 5 trials on 3 consecutive instructional sessions.

Goal 10 - Using motivational/reinforcing materials, in structured and unstructured environments, Student will engage in developmental age appropriate parallel play near peers, for 10 minutes, with no prompts, across 3 consecutive instructional sessions, as measured by teacher data collection/notations. Data will be collected for each instructional session.

STO 1: By 10/12/2012, using motivational/reinforcing materials, in structured and unstructured environments, Student will engage in parallel play near peers for 7 minutes, with 2 prompts, over 3 consecutive instructional sessions.

STO 2: By 12/21/2012, using motivational/reinforcing materials, in structured and unstructured environments, Student will engage in parallel play near peers for 8 minutes, with 1 prompt, over 3 consecutive instructional sessions.

STO 3: By 3/8/2013, using motivational/reinforcing materials, in structured and unstructured environments, Student will engage in parallel play near peers for 9 minutes, with no prompts, over 3 consecutive instructional sessions.

Goal 11 - Given an outline of 3 different shapes on a half sheet of letter-size paper (e.g. square, circle, triangle), Student will color in the area of the shape with 80% coverage, on 8 of 10 opportunities over 3 consecutive instructional sessions, as measured by a worksheet permanent product to record data, Data will be collected for each instructional session.

STO 1: By 10/12/2012, Given an outline of 3 different shapes (e.g. square, circle, triangle) on a half sheet of letter-size paper, Student will color in the 3 shapes with 35% coverage, on 8 out of 10 opportunities over 3 consecutive instructional sessions.

STO 2: By 12/21/2012, Given an outline of 3 different shapes (e.g. square, circle, triangle) on a half sheet of letter-size paper, Student will color in the 3 shapes with 50% coverage, on 8 out of 10 opportunities over 3 consecutive instructional sessions.

STO 3: By 3/8/2013, Given an outline of 3 different shapes (e.g. square, circle, triangle) on a half sheet of letter-size paper, Student will color in the 3 shapes with 75% coverage, on 8 out of 10 opportunities over 3 consecutive instructional sessions.

Goal 12 - Given 6 simple oral instructions (e.g. hands up, pick it up, push, pull, give me, take) from 2 people and in 2 different settings, Student will follow instructions with 80% accuracy across 3 consecutive instructional sessions, recorded using a trial-by-trial data sheet.  Data will be collected for each instructional session.

STO 1: By 10/12/2012, Student will follow 1 simple oral instruction (e.g. hands up) with 80% accuracy across 3 consecutive instructional sessions.

STO 2: By 12/21/2012, Student will follow 3 simple oral instructions (e.g. hands up, pick it up, push) from 2 people and in 2 different

settings, with 80% accuracy across 3 consecutive instructional sessions.

STO 3: By 3/8/2013, Student will follow 4 simple oral instructions (e.g. hands up, pick it up, push, pull) from 2 people and in 2 different settings, with 80% accuracy across 3 consecutive instructional sessions.

Goal 13 - Given models of 6 object motor actions (e.g. shake a maraca, roll a ball, push a car on a track, fly a plane, wave a bubble wand, put a piece into a Mr. Potato Head), and a direction to "do this," Student will independently imitate the object motor action with 80% accuracy across 3 consecutive instructional sessions, recorded using a trial by trial data sheet. Data will be collected for each instructional session.

STO 1: By 10/12/2012, Given models of 2 motor actions (e.g. shake a maraca, roll a ball), a direction to "do this," and partial physical prompting, Student will imitate the object motor action with 80% accuracy across 3 consecutive instructional sessions.

STO 2: By 12/21/2012, Given models of 2 motor actions (e.g. shake a maraca,  roll a ball), [and] a direction to "do this,"  Student will independently imitate the object motor action with 80% accuracy across 3 consecutive instructional sessions. Given models of 2 motor actions (e.g. push a car on a track, fly a plane), a direction to "do this" and partial physical prompting, Student will imitate the object motor action with 80% accuracy across 3 consecutive instructional sessions.

STO 3: By 3/8/2013, Given models of 4 motor actions (e.g. shake a maraca, roll a ball, push a car on a track, fly a plane) and a direction to "do this," Student will independently imitate the object motor action with 80% accuracy across 3 consecutive instructional sessions. Given models of 2 motor actions (e.g. wave a bubble wand, put a piece into a Mr. Potato Head), a direction to "do this," and partial physical prompting,  Student will  imitate the object motor action with 80% accuracy across 3 consecutive instructional sessions.

Goal 14 - Student will independently rise to a stand from the floor using a half-kneel position, with only one hand for support, 2 times in one session, on 3 different sessions, measured using staff logs. Data will be collected for each instructional session.

STO 1: By 10/12/2012, Student will rise to stand via a half-kneel position, with one hand for support, once.

STO 2: By 12/21/2012, Student will rise to stand via a half-kneel position, with one hand for support, 2 times in one session.

STO 3: By 3/8/2013, Student will rise to stand via a half-kneel position, with one hand for support, 2 times in one session, over 3 sessions.

Goal 15 - When seated on a playground swing and after being given a push to start, Student will pump the swing by actively moving his arms, trunk, and/or legs 12 times in a row, twice in one session, over 3 different sessions, measured using staff logs. Data will be collected for each session.

> STO 1: By 10/12/2012, Student will pump a swing 6 times in a row, 2 times in one session.

> STO 2: By 12/21/2012, Student will pump a swing 12 times in a row, 2 times in one session.

> STO 3: By 3/8/2013, Student will pump a swing 12 times in a row, 2 times in one session, over 3 sessions.

(IRR 260 at 5–11). At the time of adoption, Plaintiff and Tara Middlebrook-Oskowis (collectively "Parents") approved the August 2012 IEP as adequate and reasonably calculated to provide an educational benefit to Student. (IRR 260 at 12).

Notably, the August 2012 IEP also specified that "[s]pecial education staff will take data daily" and "[d]ata format will be utilized as determined by mediation agreement." (IRR 192 at 28). The August 2012 IEP did not specify which mediation agreement was to control, and the parties did not clarify this for the Court.[4]

## B.    Procedural Background

The record clearly shows that Parents have been actively involved in Student's education by vigorously pursuing the rights and remedies allotted under the IDEA. Particularly, Parents routinely reported their concerns regarding Student's educational progress to the IEP Team, consistently advocated for additional information regarding the implementation of Student's IEP, requested that District provide supplemental services that extend beyond the traditional educational curriculum provided in the classroom, and filed multiple due process complaints that predate the due process complaints underlying

---

[4] The ALJ noted that the operative mediation agreement was not offered into evidence during the administrative hearings. (IRR 260 at 11). After review of the parties' filings and the administrative record, the relevant agreement could be the October 25, 2011 mediation agreement between District and Parents stating that "[d]ata sheets will be revised to include criteria and notations when appropriate for tracking goals agreed upon by the IEP team." (IRR 245 at 2). According to Plaintiff's third due process complaint, the utilized "data format" was to be the "comprehensive data sheet." (Doc. 1-1 at 59).

this lawsuit. Parents' actions, however, have contributed to an increasingly strained relationship with District.

This appeal emerges from the ALJ's decision regarding four due process complaints filed by Plaintiff. *See* (Doc. 1). On July 12, 2013, Plaintiff submitted the first underlying due process complaint alleging that District failed to properly implement the August 2012 IEP thereby depriving Student of a free appropriate public education ("FAPE") for the 2012–2013 academic year. (Doc. 1-1 at 2–19). In this complaint, Plaintiff argued that District disregarded the August 2012 IEP by not advancing Student to the next STO within a reasonable time after mastering a prior STO. (*Id.* at 11–16). Plaintiff also asserted that District violated the August 2012 IEP by failing to consistently implement certain STOs. (*Id.*) As relief, Plaintiff requested compensatory educational service hours and the appointment of a recognized independent, third-party authority to supervise and oversee Student's educational program. (*Id.* at 16–19).

Approximately one month after Plaintiff filed the first due process complaint in dispute here, Student's IEP Team met to begin drafting Student's IEP for the 2013–2014 academic year. (IRR 260 at 17). The IEP Team assembled on four different occasions between May and August 2013 to develop the IEP. (*Id.*) During these meetings, Parents believed they were not given sufficient opportunity to voice their concerns and be heard by the IEP Team. (Doc. 1-1 at 28–47). Consequently, Plaintiff filed a second due process complaint on September 3, 2013 claiming that District violated the IDEA by deliberately seeking to limit parental participation in the IEP development process. (*Id.*) This second complaint also alleged that District failed to provide a complete set of Student's educational records upon request, that an occupational therapist and a speech therapist were not present at the May 9, 2013 Multidisciplinary Evaluation Team meeting as required, and that the Prior Written Notice ("PWN") issued to Parents following the August 15, 2013 IEP meeting was defective. (*Id.*) For relief, Plaintiff requested that the August 2012 IEP remain in effect until a new IEP could be developed for the 2013–2014 academic year. (*Id.*)

In November 2013, the two due process complaints were consolidated and the ALJ conducted a three-day administrative hearing to review the two complaints. (IRR 260 at 3). Before the ALJ rendered a decision, however, Plaintiff filed a third due process complaint on November 26, 2013 with the Arizona Department of Educational Exceptional Student Services Dispute Resolution Unit ("Resolution Unit"). (*Id.*) This complaint alleged that District violated the IDEA by failing to provide Student with 1,200 special education service minutes and 200 minutes of Sensory Diet by an Occupational Therapist on a weekly basis, as required by the August 2012 IEP. (*Id.*) For relief, Plaintiff sought 350 compensatory educational service hours, 117 hours of compensatory occupational therapy, and the appointment of an independent third-party authority to supervise and oversee Student's educational program. (*Id.*)

Because the ALJ determined that the issues raised in the three due process complaints were substantially related, she consolidated the complaints and reopened the record to receive further evidence. (*Id.*) Subsequently, on January 8, 2014, Plaintiff filed a fourth due process complaint with the Resolution Unit contending that District violated the IDEA by failing to provide Parents with PWNs of changes to the August 2012 IEP. (*Id.* at 3–4). As relief, Plaintiff requested an independent, third-party be assigned to supervise and oversee Student's educational program. (*Id.* at 4).

Because the issues raised in the fourth due process complaint were substantially related to the prior three complaints, all four cases were consolidated and a second administrative hearing was held on April 2, 2014. (*Id.*). On August 4, 2014, the ALJ issued her decision after requesting two time extensions. (*Id.* at 1, 27). In her decision, the ALJ concluded that District denied Student a FAPE when it failed to advance Student to the next STO within a reasonable time once Student demonstrated mastery of a prior STO. (*Id.* at 21–22). This failure, the ALJ found, related to four of the fifteen annual goals in the August 2012 IEP—specifically, Goals 1, 2, 3, and 13. (*Id.* at 22, 26). The ALJ further concluded that Parents were afforded the opportunity to meaningfully participate in the development of Student's 2013–2014 IEP and denied Plaintiff's various

other procedural complaints. (*Id.* at 22–26). Ultimately, because "[n]either party presented any evidence to demonstrate what portion of Student's typical day would have been spent engaged in [Goals 1, 2, 3, and 13]," the ALJ, in her "discretion," awarded Student ninety compensatory hours. (*Id.* at 26–27).

## II.     Legal Standards

### A.     The IDEA

The IDEA was originally enacted to require state educational agencies receiving federal funds to provide special education services for children with qualifying disabilities. *See* 20 U.S.C. § 1400(d)(1)(A). The IDEA mandates that public school districts provide qualifying students a "basic floor of opportunity"; it does not obligate the school to maximize each child's potential. *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 198–204 (1982); *see J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 439 (9th Cir. 2010) (explaining that compliance with the IDEA does not require school districts to provide the "absolutely best" or "potential-maximizing" education (citation and internal quotation marks omitted)). Thus, a child will be deemed to have received a FAPE if the program of instruction: "(1) addresses his unique needs, (2) provides adequate support services so he can take advantage of the educational opportunities, and (3) is in accord with an [IEP]." *Park, ex rel. Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1033 (9th Cir. 2006) (citing *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 893 (9th Cir. 1995)); *see* 20 U.S.C. § 1401(9).

To provide a FAPE in compliance with the IDEA, a public school district must evaluate a student, determine whether that student is eligible for special education, and formulate and implement an IEP. *See* 20 U.S.C. § 1414. An IEP informs how a qualifying child is to be educated, especially with regard to the child's needs that result from the child's disability. Pursuant to the IDEA, school districts are required to construct an IEP Team comprised of various school personnel and the student's parents to develop an IEP for each qualifying student. *Id.* § 1414(d)(1)(B). Within a student's IEP are annual goals, and for students who do not take a standard state assessment, each annual goal of the

student's IEP is required to have STOs. *Id.* § 1414(d)(1)(A)(i)(I)(cc). The IEP Team must consider the strengths of the child, concerns of the parents, evaluation results, and the academic, developmental, and functional needs of the child. *Id.* § 1414(d)(3)(A).

Regarding IEP implementation, the Ninth Circuit has held that "a material failure to implement an IEP violates the IDEA. A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP." *Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 815 (9th Cir. 2007). Although this standard "does not require that the child suffer demonstrable educational harm in order to prevail[,] the child's educational progress, or lack of it, may be probative of whether there has been more than a minor shortfall in the services provided." *Id.* at 822.

## B. Standard of Review

The IDEA grants judicial review to parties who are dissatisfied with the findings and decision rendered in an administrative hearing. *See* 20 U.S.C. § 1415(i)(2)(A). The party challenging the ALJ's decision bears the burden of persuasion at the judicial level. *See, e.g.*, *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 910 (9th Cir. 2009); *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

Pursuant to the IDEA, federal courts accord considerably less deference to state administrative proceedings than they do in other instances of "judicial review of . . . agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." *E.M. v. Pajaro Valley Unified Sch. Dist. Office of Admin. Hearings*, 652 F.3d 999, 1005 (9th Cir. 2011) (quotation omitted). The IDEA empowers the reviewing court to hear evidence that goes beyond the scope of the administrative record and, based on a preponderance of the evidence, "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). On the other hand, "[c]omplete de novo review . . . is inappropriate." *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 887 (9th Cir. 2001). Generally, administrative proceedings are accorded "due weight" and the reviewing court must "consider the

findings carefully[.]" *R.B. ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 937 (9th Cir. 2007) (quotation omitted); *see L.M.*, 556 F.3d at 908 (finding that courts are "free to determine independently how much weight to give the administrative findings [but] the courts are not permitted simply to ignore [them]"). An ALJ's "thorough and careful" findings can receive "particular deference." *Napa Valley*, 496 F.3d at 937 (citing *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994)); *see Adams v. Oregon*, 195 F.3d 1141, 1145, 1150 (9th Cir. 1999) ("[T]he amount of deference bestowed upon the hearing officer is increased where her findings are thorough and complete." (quotation omitted)). "In the end, however, the court is free to determine independently how much weight to give the state hearing officer's determinations." *Ashland Sch. Dist. v. Parents of Student R.J.*, 588 F.3d 1004, 1009 (9th Cir. 2009) (citations omitted).

The ALJ's decision in this case is a twenty-seven page order setting forth the witnesses, procedural history, evidence and issues raised at the two hearings, detailed findings of fact with citations to the record, and a recitation and application of the law. *See* (IRR 260). The decision expressly states that the ALJ "has read and considered each admitted Exhibit" and "considered the testimony of every witness," even if not mentioned in the decision. (*Id.* at 4). The transcripts of the four days of hearings also show that the ALJ questioned witnesses to further develop her understanding of the facts and issues in dispute. The ALJ's decision contains citations to the supporting documents and testimony and is "thorough and careful." The ALJ's conclusions of law are thorough and set forth the legal standard with citations to case law and statutes. Further, the ALJ was conscious of the applicable legal standards and applied those standards. Under these circumstances, the Court concludes that the ALJ's findings are entitled to "particular deference." *See Napa Valley*, 496 F.3d at 937; *Sam M. V. Capistrano Unified Sch. Dist.*, 556b F.3d 900, 908 (9th Cir. 2009) (finding that an ALJ's twenty page decision "certainly met" the standard of "thorough and careful").

**III.   Analysis**

In his Complaint, Plaintiff asserts that the ALJ committed eighteen errors. *See*

(Doc. 1 at 11–13). In his Opening Brief, however, Plaintiff presents and addresses only six questions for judicial review. *See* (Doc. 32 at 2–3).[5] The dozen errors listed in Plaintiff's Complaint but not briefed in his Opening Brief are therefore deemed abandoned and waived for failure to brief the arguments. *See M.M. v. Lafayette Sch. Dist.*, 767 F.3d 842, 861 (9th Cir. 2014) *as amended* (Oct. 1, 2014) ("The parents fail to brief the stayed Department of Education investigation theory, and it is therefore waived. Likewise, we do not address number 14 and number 26 of the parents' questions presented for failure to brief the arguments."); *United States v. Williamson*, 439 F.3d 1125, 1137–38 (9th Cir. 2006) (holding that issues raised in an appellate brief but not supported by argument are abandoned); *Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) ("We review only issues which are argued specifically and distinctly in a party's opening brief. We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review." (citations omitted)).

In his Opening Brief, Plaintiff first contends that the ALJ erred when she concluded that Student received a FAPE for eleven of the fifteen annual goals during the 2012–2013 academic year. (Doc. 32 at 2). Specifically, Plaintiff asserts that District did not timely advance Student to the next STO after mastery of a prior STO and failed to consistently implement several STOs. (*Id.*) Plaintiff next argues that the ALJ erred by awarding only ninety compensatory hours to Student. (*Id.*) Third, Plaintiff claims that the ALJ erred by not considering Ken Baumgartner's statements related to the calculation of educational service hours. (*Id.* at 3). Fourth, Plaintiff complains that the ALJ erred by issuing her ruling 124 days after the final due process hearing. (*Id.*) Fifth, Plaintiff contends the ALJ erred by issuing her ruling 388 days after the first due process complaint was filed. (*Id.*) Finally, Plaintiff asserts that the ALJ erred by waiting to issue

---

[5] Plaintiff also noted in his Opening Brief that throughout the "course of this brief, the Plaintiff has demonstrated *all* of the key points that the ALJ erred in her decision." (*Id.* at 11) (emphasis added).

her decision for the first and second complaints until after a hearing on the third and fourth complaints. (*Id.*)

The parties have filed with the Court the record from the administrative proceedings. (Doc. 19). Neither party has asked the Court to consider additional evidence. The Court will now review each of Plaintiff's arguments in turn.

### A. Did the ALJ err by finding that District properly implemented eleven of the fifteen annual goals in Student's August 2012 IEP?

Plaintiff's first contention is that the ALJ erred when she concluded that District failed to adequately implement only four of the fifteen annual goals in Student's August 2012 IEP. (Doc. 32 at 4–5). As Plaintiff explains, the first due process complaint alleged that District failed to: (A) timely advance Student to the next STO after mastery of a prior STO for Goals 1, 3, 6, and 10; and (B) appropriately implement Goals 2, 7, 8, and 11 due to inconsistent approaches. *See* (Doc. 1-1 at 12). Although Plaintiff's first due process complaint alleged improper implementation of Goals 1, 2, 3, 6, 7, 8, 10, and 11, the ALJ provided her reasoning for Goals 1, 2, 3, 7, 8, 9, 12, and 13. *See* (IRR 260 at 12–13). Plaintiff thus asserts that the ALJ erred by "leaving out" Goals 6, 10, and 11 and also by incorrectly analyzing Goals 7 and 8. (Doc. 32 at 5).[6]

Plaintiff's first due process complaint alleges that Student was denied a FAPE as a result of District's delay in advancing Student to the next STO for Goals 6 and 10. (Doc. 1-1 at 13). The Court does not agree. As stated above, a "material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP." *Van Duyn*, 502 F.3d at 815. According to the data sheets for Goal 6, Student appeared to master STO 3 on January 16, 2013 but was not advanced to the full goal for the remainder of the school year. (IRR 159). On its face, District's failure to advance Student to the final goal for five months

---

[6] Plaintiff does not claim that the ALJ overstepped her authority by considering Goals 12 and 13, which were not asserted in the first due process complaint. Moreover, beyond stating that the ALJ erred, Plaintiff's Opening Brief does not explain why the ALJ's analysis was incorrect for any of the goals.

appears to be a "material failure to implement" Goal 6. However, an examination of the data sheets leads to a different conclusion. Although the data sheets show that Student worked on STO 3 after January 16, 2013, Student was actually attempting the full goal as he was independently participating in turn-taking activities of up to three exchanges over two days. *See* (*id.*) The Court finds that this "minor discrepancy" was not a "material failure" on behalf of District. *See Van Duyn*, 502 F.3d at 815.

A review of the data sheets for Goal 10 produces the same result. Although District recorded that Student was attempting STO 3 for Goal 10, the data sheets show that Student was attempting the tasks designated as the full goal. *See* (IRR 163). Specifically, Goal 10 required Student to engage in "developmental age appropriate parallel play" near peers for increasing periods of time and with decreasing prompting from an instructor. *See* (IRR 192 at 21). STO 3 required Student to engage in parallel play with no prompts for nine minutes, while the full goal required the same actions but for ten minutes. (*Id.*) Although the data sheets record that Student likely satisfied STO 3's requirements in February 2013 and continued working on STO 3 until the end of the school year, Student was given the opportunity to engage in parallel play near peers for ten minutes or longer for the vast majority of the remaining sessions. *See* (IRR 163). Consequently, the Court finds that District did not materially fail to implement Goal 10.

Plaintiff next contends that the ALJ erred by finding that District's "inconsistent approaches" to Goals 7 and 8 did not deny Student a FAPE. (Doc. 32 at 5). The inconsistencies—if there were any at all—with District's implementation of Goals 7 and 8 were "minor discrepancies" not "material failures." Specifically, as to Goal 7, Student was allowed numerous opportunities to request missing items (e.g., spoon, fork, mouse, DVD, drink, French fry, remote, chair, ball, game, puzzle, and train) with the "I want" icon from his PECS book. *See* (IRR 160). Similarly, for Goal 8, although District provided Student with one and two three-step actions instead of always two three-step actions, this was not a material failure but a minor discrepancy. *See* (IRR 161). As Dr. Spencer and Mr. Baumgartner explained, special education teachers must be afforded

flexibility in their instructional methods in order to adapt to a student's particular needs each day. (IRR 263 at 108, 215). Ultimately, even though District arguably may have taken modified approaches to Goals 7 and 8, Student received a "basic floor of opportunity"—which is all the IDEA requires. *See Rowley*, 458 U.S. at 198–204.

Plaintiff finally contends that the ALJ erred by "leaving out" Goal 11. (Doc. 32 at 5). Plaintiff's first due process complaint alleges that District denied Student a FAPE regarding Goal 11 due to "inconsistent approaches." (Doc. 1-1 at 13). After reviewing the data sheets, the Court finds that District's implementation of Goal 11 was sufficiently aligned with the STOs such that Student was afforded a "basic floor of opportunity." Specifically, Goal 11 required Student to color three geometric shapes with increasing levels of within-the-lines coverage. (IRR 192 at 20). While implementing this goal, District always permitted Student to color three shapes and simply advanced Student to the next STO with a higher coverage percentage. *See* (IRR 164). There is no substantive difference from one STO to the next in this regard—Student always colored three shapes—and any inconsistency in District's approach was a minor discrepancy not a material failure.

For these reasons, the Court finds that the ALJ did not err when she determined that District properly implemented eleven of fifteen annual goals in the August 2012 IEP.

**B.      Did the ALJ err in awarding Student ninety compensatory hours?**

Plaintiff next contends that the ALJ erred by awarding Student ninety compensatory hours. (Doc. 32 at 5–9). District responds that the ALJ properly exercised her discretion in awarding this amount and argues that the Ninth Circuit does not compel an ALJ to award compensatory education on a "minute-by-minute" basis. (Doc. 33 at 7–9) (citing *Park*, 464 F.3d at 1033)).

The ALJ calculated her award of ninety compensatory hours in the following manner:

> 35. Neither party presented any evidence to demonstrate what portion of Student's typical day would have been spent engaged in those annual goals. Accordingly, the Administrative Law Judge has discretion in fashioning an

appropriate award of compensatory education.

36. The times during which Student remained on an STO after demonstrating mastery and before being advanced to the next STO with respect to these four annual goals averaged between six and seven months. The annual goals identified fall into the categories of Basic Reading Skills, Math, and Listening Comprehension. According to the August 2012 IEP, those areas of special education services account for 480 minutes per week of instruction, or 96 minutes per day. However, these annual goals do not represent the only instruction provided to Student within those areas. Generously estimating that the four annual goals constituted 40 percent of Student's instruction in those areas, the minutes lost to Student due to Respondent School's material failure to implement the IEP in those areas can be calculated as follows: 40 percent of 96 minutes per day would be approximately 38 minutes per day, and 38 minutes per day over seven months of 20 days per month would be 5320 minutes or approximately 89 hours.

37. Accordingly, the Administrative Law Judge concludes that Student is entitled to compensatory education for that failure to provide Student a FAPE with respect to those Annual Goals in the amount of 90 hours.

(IRR 260 at 26–27). Notwithstanding the "particular deference" given to the ALJ's decision, the Court has identified two errors in the ALJ's calculations that such deference cannot overlook. First, the Court does not agree that the four identified goals only relate to Basic Reading Skills, Math, and Listening Comprehension. Second, the underlying basis of the ALJ's award was that the improperly implemented goals did "not represent the only instruction provided to Student within those areas" but "generously" constituted forty percent of the instruction for those areas. (*Id.* at 27). As discussed below, this approximation is unsupported by the record.

### 1.    Designation of Annual Goals

Once the ALJ determined that District improperly implemented four annual goals of the August 2012 IEP, the next step was to develop an equitable way to calculate compensatory education for those goals. Because the August 2012 IEP did not include a specific time quota for each goal, the ALJ associated the goals with categories of "Special Education Services" listed in the final section of the IEP. (*Id.* at 25–26). As each

Special Education Service category was apportioned a set number of service minutes for each week or month, the ALJ found this to be a reasonable method of calculating how many compensatory education hours to award Student. Ultimately, the ALJ concluded that Goals 1 and 2 correlated with the category of Basic Reading Skills, Goal 3 associated with Math, and Goal 13 related to Listening Comprehension. (*Id.* at 26–27).

The Court agrees that calculating compensatory education hours in this case is best accomplished by matching the annual goals with Special Education Services categories. According to the August 2012 IEP, the annual goals relate to the following "Skill Areas":

A. Goals 1 and 2: Language Arts
B. Goal 3: Math
C. Goals 4 and 5: Daily Living Skills
D. Goals 6, 7, and 8: Communication
E. Goals 9, 10, 11, and 12: Social Emotional
F. Goals 13, 14, and 15: Related Services

(IRR 192 at 16–24). The August 2012 IEP also allocates the number of service minutes to be provided to Student. The minutes are set forth as follows:

A. Special Education Services to be Provided
　　1. Activities of Daily Living: 100 minutes per week
　　2. Basic Reading Skills: 200 minutes per week
　　3. Math: 180 minutes per week
　　4. Written Expression: 200 minutes per week
　　5. Interpersonal/Social Skills: 200 minutes per week
　　6. Oral Expression: 100 minutes per week
　　7. Listening Comprehension: 100 minutes per week

B. Related Services
　　1. Occupational Therapy: 120 minutes per month
　　2. Physical Therapy: 90 minutes per month
　　3. Speech: 240 minutes per month

C. Supplementary Aids/Assistive Technology and Services for Students
　　1. PECS: 1,200 minutes per week
　　2. Paraprofessional: 1,200 minutes per week
　　3. Sensory Diet: 200 minutes per week

(*Id.* at 28–29). As readily observed, the IEP's service minute categories do not mirror the Skill Areas attributed to the annual goals. Although Plaintiff believes this "obfuscation

- 20 -

[was] done intentionally to eliminate the Defendant's accountability regarding the IEP since there is no way to easily ascertain how many service minutes are assigned to which goal," (Doc. 32 at 6), his argument is belied by Parents' direct participation and approval of the IEP's language and content, *see* (IRR 260 at 12). Nevertheless, the ALJ and this Court were left with four improperly implemented annual goals that do not directly match with service minute categories.

Although the Court agrees with the ALJ that Goals 1 and 2 correlate with Basic Reading Skills and Goal 3 associates with Math, the ALJ erred by designating Goal 13 only as Listening Comprehension. Goal 13 is identified as a "Related Service"[7] with the "Service Providers" listed as "Special Education Teacher, Paraprofessional, and OT/OTA." (IRR 192 at 23). The only "provider" identified for Occupational Therapy[8] is "OT/OTA," *see* (*id.* at 28), and the only annual goal with an OT/OTA service provider is Goal 13, *see* (*id.* at 23). Thus, Goal 13 must associate with the Related Service of Occupational Therapy. Furthermore, the "Occupational Therapy Notes" recorded in the August 2012 IEP describe Student's ability to perform the activities outlined in Goal 13. *See* (*id.* at 10) (describing Student's ability to perform "object motor actions" with the verbal direction to "do this"). Accordingly, the ALJ erred by not designating Goal 13 as both Listening Comprehension and Occupational Therapy.[9]

---

[7] Services qualify as "related services" if they are supportive services required for a disabled child to benefit from special education. *Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883 (1984). Related services are defined as "such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children." 20 U.S.C. § 1401(26)(A).

[8] Occupational therapy is provided to address: "(A) Improving, developing or restoring functions impaired or lost through illness, injury, or deprivation; (B) Improving ability to perform tasks for independent functioning if functions are impaired or lost; and (C) Preventing, through early intervention, initial or further impairment or loss of function." 34 C.F.R. § 300.34(c)(6)(ii).

[9] Plaintiff argues that the ALJ erred by not considering certain statements made by Student's special education teacher during the August 2012 IEP meeting when

## 2.      Service Minutes

As a second error, the Court finds that the ALJ incorrectly concluded that Goals 1, 2, and 3 were forty percent of the instruction provided to Student within the Basic Reading Skills and Math categories. Although an ALJ has considerable discretion in her analysis, it appears, as Plaintiff argues, that the ALJ "pulled a number out of thin air." (Doc. 32 at 8). The ALJ offered no justification for her forty percent figure and uniformly applied it to each improperly implemented goal.[10] Contrary to the ALJ's forty percent determination, the only annual goals that plausibly correlate with the Special Education Service category of Basic Reading Skills are Goals 1 and 2. Similarly, Goal 3 is the only goal attributed to the Special Education Service of Math. Because there is no overlap with other annual goals in these Special Education Service areas, the Court finds that the ALJ should have awarded the full service minutes allotted by the August 2012 IEP.

For these reasons, the Court holds as follows:

---

associating annual goals with Special Education Services. (Doc. 32 at 3). The Court has reviewed the portion of the August 2012 IEP meeting to which Plaintiff refers, but does not find that it compels a different association beyond finding that Goal 13 relates to Occupational Therapy.

[10] The ALJ did mention that "the evidence established that there were numerous instructional sessions throughout Student's day that could not have been reduced to a DTT data sheet." (IRR 260 at 22). In this regard, the ALJ deemed persuasive the testimony of Dr. Trina Spencer who explained that other, non-recorded experiences during the school day provided Student with an educational benefit related to these service areas. (*Id.* at 14). Dr. Spencer emphasized, however, that these non-"sitting at a table" activities were "especially" important for "natural language" and "natural social interaction." (IRR 262 at 268; 260 at 14). While the Court finds value in Dr. Spencer's testimony, Student was denied a FAPE with regard to math and reading, subjects requiring repetition and "sitting at a table." These academic fields are unlike "natural language" and "natural social interaction" which, as Dr. Spencer observed, necessitate a high level of social involvement. *See* (IRR 262 at 268).

As to Goal 13, the Court will not speculate as to what portion of Student's day was devoted to non-data-sheet-recorded Listening Comprehension activities. The August 2012 IEP expressly required District to record data daily, and the ALJ's arbitrary determination that District delivers sixty percent of the allotted time without documentation was error.

- Goal 13 is the only annual goal associated with the Related Service of Occupational Therapy. Plaintiff should therefore be awarded all 100 minutes per month as allotted by the August 2012 IEP. Across seven months, this equals 700 minutes of compensatory Occupational Therapy, or about twelve hours. Goal 13 was also one of two annual goals relating to Listening Comprehension. Thus, one-half of the 100 weekly minutes of instruction would be fifty minutes per week or ten minutes per day. Ten minutes per day for seven months at twenty days per month equates to 1,400 minutes or about twenty-three hours. Plaintiff is thus awarded twenty-three hours of Special Education Services and twelve hours of Occupational Therapy based on Goal 13.

- Goal 3 is the only annual goal related to the Special Education Service of Math. For this service, the August 2012 IEP allotted 180 minutes per week, or thirty-six minutes per day. Thirty-six minutes per day for seven months with twenty days a month is 5,040 minutes or eighty-four hours. Consequently, Plaintiff is awarded eighty-four hours of Special Education Services based on Goal 3.

- Goals 1 and 2 are the only annual goals correlating to Basic Reading Skills. The August 2012 IEP allotted Basic Reading Skills 200 minutes per week, or forty minutes per day. Forty minutes per day for seven months with twenty days a month is 5,600 minutes or about ninety-three hours. Accordingly, Plaintiff is awarded ninety-three hours of Special Education Services based on Goals 1 and 2.

Accordingly, the Court exercises its broad and "equitable" discretion to craft "appropriate" relief and awards Student 200 compensatory hours of Special Education Services and twelve compensatory hours of Occupational Therapy. *See* 20 U.S.C. § 1415(i)(2)(C); *Parents of Student W. v. Puyallup Sch. Dist., No. 3*, 31 F.3d 1489, 1497 (9th Cir. 1994) (noting that a district court's charge to "fashion appropriate relief" is

"equitable" in nature).

### C. Procedural Timeline

Plaintiff's last three contentions of error concern the ALJ's management of the four due process complaints. Specifically, Plaintiff argues that the ALJ erred when she issued her decision on August 4, 2014, which is 124 days after the final due process hearing on April 2, 2014. (Doc. 32 at 3, 9–11). Similarly, Plaintiff asserts that the ALJ erred by issuing her decision 388 days after the first due process complaint was filed and by waiting to decide the first two complaints until after a hearing regarding the third and fourth complaints. (*Id.*)

In response, District contends that the ALJ properly consolidated the four complaints and appropriately requested additional time to issue her written decision after the April 2, 2014 hearing. (Doc. 33 at 10). District further argues that "Plaintiff can point to no harm or prejudice to the student's program, as the issues presented concerned the student's program for a prior school year." (*Id.* at 10–11).

#### 1. Legal Standard

The IDEA's procedural safeguards are designed to achieve its substantive objectives and are thus a critical component of the statute. *See Rowley*, 458 U.S. at 205–06 ("Congress placed every bit as much emphasis upon compliance with procedures . . . as it did upon the measurement of the resulting IEP against a substantive standard."). Generally, a public agency must ensure that a decision is issued within seventy-five days of a party's request for a due process hearing. 34 C.F.R. §§ 300.510(b)–(c), 300.515(a). Although a hearing officer may grant specific extensions of time at the request of either party, 34 C.F.R. § 300.515(c), an extension beyond the seventy-five day period may constitute a denial of a FAPE, *see, e.g.*, *Blackman v. Dist. of Columbia*, 277 F. Supp. 2d 71, 79 (D.D.C. 2003) ("[T]he failure to provide a written determination in a timely manner after requests for an IEP meeting or a hearing have been made constitutes the denial of a free appropriate public education as required by the IDEA." (citing *Walker v. Dist. of Columbia*, 157 F. Supp. 2d 11, 31 (D.D.C. 2009)).

A procedural violation generally does not constitute the denial of a FAPE unless the procedural inadequacy: "(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii); *see, e.g.*, *N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1208 (9th Cir. 2008) ("Not every procedural violation . . . is sufficient to support a finding that the child in question was denied a FAPE" (quoting *Amanda J.*, 267 F.3d at 892)). Ultimately, whether a procedural violation of the IDEA results in a denial of FAPE turns on whether the "violation affected the substantive rights of the parent or child." *L.M.*, 556 F.3d at 909.

Although the Court is unaware of any Ninth Circuit case law specifically analyzing the delay of a due process determination under § 300.515(a), several district courts within the circuit have reviewed similar procedural violation claims. In *Dep't of Educ. v. T.G.*, the United States District Court for the District of Hawaii held that a school district's "failure to provide a resolution session, convene a due process hearing, and issue [an] administrative decision within the timelines established by § 300.510 and § 300.515 violated [the student's] substantive rights." 2011 WL 816808, at *9 (D. Haw. Feb. 28, 2011). In *E.M. v. Pajaro Valley Unified School District*, the United States District Court for the Northern District of California suggested that, while a failure to hold a due process hearing may rise to a denial of a FAPE, the issuance of an administrative IDEA decision beyond § 300.515(a)'s deadline alone did not constitute a *per se* denial. 2006 WL 3507926, at *6 (N.D. Cal. Dec. 5, 2006). Finally, in *Miller v. Monroe Sch. Dist.*, the United States District Court for the District of Washington found that a school district denied a student a FAPE when the ALJ's decision was rendered 142 days after the decision was due, the student's education was "in flux" during the interim period, and the record was unclear whether the student was in an appropriate placement during the pendency of the case. 2015 WL 5478149, at *3 (W.D. Wash. Sept. 17, 2015).

2.      **Analysis**

Here, Plaintiff filed his first due process complaint on July 12, 2013, *see* (Doc. 1-1), and requested a hearing on July 15, 2013, *see* (IRR 1). Generally, it was the District's responsibility to ensure that a decision resolving Plaintiff's complaint was issued within seventy-five days. *See* 34 C.F.R. §§ 300.510(b)–(c), 300.515(a). However, after a hearing for the first complaint was scheduled, Plaintiff filed a second due process complaint on September 3, 2013. (Doc. 1-1 at 28). The ALJ consolidated the two complaints, extended the timeline, and held a three-day due process hearing regarding the two complaints in mid-November 2013. (IRR 102, 261–63).[11] A few days after the hearing, Plaintiff filed a third due process complaint alleging that District failed to provide adequate special education services as set forth by the August 2012 IEP. (Doc. 1-1 at 49). Although neither party expressly requested consolidation of the complaints, the ALJ consolidated the three complaints, extended the timeline, and scheduled an additional hearing to hear evidence regarding the third complaint. (IRR 110).[12] Before the pre-hearing conference for the third complaint, Plaintiff filed a fourth due process complaint on January 8, 2014, alleging that District's PWNs for changes to the August 2012 IEP were defective. (Doc. 1-3 at 4). Because the four complaints contained similar issues, testimony, and evidence, the ALJ consolidated the complaints, extended the timeline of the case, and scheduled a hearing for April 2, 2014 as to issues raised in the third and fourth complaints. (IRR 112). After the April 2, 2014 occurred, the ALJ's decision was due on approximately June 17, 2014. *See* (IRR 118). However, the ALJ requested two time

---

[11] Plaintiff does not claim that the ALJ erred by consolidating these complaints and in fact consented to the consolidation. *See* (IRR 39 at 3) ("[T]he Petitioner is in agreement with these matters being consolidated as requested by Respondent's motion.").

[12] In response to the ALJ's consolidation order, District filed a motion for reconsideration stating that it "believes that there is no reason to consolidate matters." (IRR 67). In response to District's reconsideration motion, Plaintiff argued that he "feels that the Tribunal's decision to consolidate the matters *best serves both parties in the interest of justice.*" (IRR 68) (emphasis added). Ultimately, the ALJ denied District's motion for reconsideration and proceeded with the complaints in consolidated format.

extensions to issue her decision, *see* (*id.*; IRR 120), which she issued on August 4, 2014, *see* (IRR 260).

The Court does not find that the ALJ erred by consolidating the four due process complaints. Plaintiff consented to the first two consolidations and the third and fourth complaints involved the same core issues and evidence as the first complaint, namely, information related to the August 2012 IEP. Thus, the only procedural concern is the four month delay from April 2, 2013, the date of the final hearing, to August 4, 2013, when the ALJ rendered her decision.

District contends that it was appropriate for the ALJ to request two time extensions. (Doc. 33 at 10–11). The regulation District relies on for this argument, however, merely permits a hearing officer to extend a decision deadline "*at the request of either party.*" *See* 34 C.F.R. § 300.515(c) (emphasis added). Here, the ALJ *herself* requested both time extensions and stated that "[a] simple email agreeing to the request by either party to the OAH will suffice to grant the extension." (IRR 118, 120). The regulation does not permit a hearing officer to disregard the procedural guidelines at her own discretion—which is what the ALJ did here. Thus, the ALJ violated the IDEA's procedural guidelines by issuing her decision more than four months after the final due process hearing and seven months from the date Plaintiff filed his fourth complaint.[13]

Despite the Court's misgivings about the four month delay it took the ALJ to render her decision after the final due process hearing, the procedural violation was not a *per se* denial of a FAPE and Plaintiff has not shown that the delay negatively impacted a substantive right of Student or Parents—which is required for a procedural violation to constitute a denial of a FAPE, *see L.M.*, 556 F.3d at 909. The consolidated complaints concerned allegations of improper implementation of a *prior* school year's IEP, and Plaintiff does not present evidence that Student was denied special education services

---

[13] Although it could be argued that District moved for the time extensions by responding to the ALJ's requests, that would not change the outcome here. A school district's repeated requests for time extensions can constitute a procedural violation. *See Miller*, 2015 WL 5478149, at *3.

during the pendency of the administrative proceedings or during this appeal.[14] Thus, the ALJ's delay was not a denial of a FAPE because the delay did not "result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process." *L.M.*, 556 F.3d at 909; *see R.B. v. N.Y.C. Dep't of Educ.*, 15 F. Supp. 3d 421, 432 (S.D.N.Y. 2014) (holding that "[e]ven if the tardiness of the [state agency] decision constituted a procedural violation . . . that procedural violation did not result in the denial of a FAPE" because "the late issuance of the [state agency] Decision could have no impact on the substantive recommendations of the IEP or the parent's ability to participate in the IEP process").

## IV.   Attorneys' Fees

Plaintiff requests an award of attorneys' fees for both the administrative proceeding and the action before this Court. (Doc. 1 at 14). In response, District asks for an award of its attorneys' fees incurred during this appeal. (Doc. 12 at 16).

Regarding attorneys' fees, the IDEA provides as follows:

(3) Jurisdiction of district courts; attorneys' fees

. . . .

(B) Award of attorneys' fees

(i) In general

In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs—

---

[14] The Court notes that Plaintiff's second due process complaint was filed on September 3, 2013 and concerned parental participation in the creation of Student's IEP for the 2013–2014 academic year. Had the ALJ determined that Parents were not given an appropriate opportunity to participate in the IEP development, then the ALJ's delay in issuing her decision may have constituted a denial of a FAPE because parental participation is a statutory requirement of the IDEA. However, the ALJ determined that Parents were allowed an opportunity to meaningfully participate in the creation of the IEP, (IRR 260 at 26), and Plaintiff does not argue that this was error, *see* (Doc. 32 at 2–3). Thus, the delay of the ALJ's decision did not violate a substantive right of Parents.

> (I) to a prevailing party who is the parent of a child with a disability;
>
> (II) to a prevailing party who is a State educational agency or local educational agency against the attorney of a parent who files a complaint or subsequent cause of action that is frivolous, unreasonable, or without foundation, or against the attorney of a parent who continued to litigate after the litigation clearly became frivolous, unreasonable, or without foundation; or
>
> (III) to a prevailing State educational agency or local educational agency against the attorney of a parent, or against the parent, if the parent's complaint or subsequent cause of action was presented for any improper purpose, such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation.

20 U.S.C. § 1415(i)(3). Thus, a "prevailing party" may bring an action seeking an award of attorneys' fees and costs incurred in obtaining affirmative relief, where liability was established outside of the district court action itself, such as in an administrative proceeding. *Id.* § 1415(i)(3)(B)(i); *see Lucht v. Molalla River Sch. Dist.*, 225 F.3d 1023, 1026 (9th Cir. 2000).

Plaintiff has not presented any evidence—nor does the record suggest—that he hired an attorney during the administrative proceedings or for his appeal before this Court. Thus, because Plaintiff is litigating *pro se*, the IDEA's attorneys' fees provision is inapplicable. *See, e.g.*, *Blanchard v. Morton Sch. Dist.*, 509 F.3d 934, 938 (9th Cir. 2007) ("*Pro se* plaintiffs . . . are not entitled to attorney's fees."); *Stassart v. Lakeside Joint Sch. Dist.*, 2009 WL 3188244, at *14 (N.D. Cal. Sept. 29, 2009) (holding that a disabled child's parents who proceeded *pro se* were not entitled to an award of attorneys' fees under the IDEA).

District's request will also be denied because District has not shown that Plaintiff filed this complaint "for any improper purpose, such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation," nor was District a "prevailing party." 20 U.S.C. § 1415(i)(3)(B)(i).

## V.        Conclusion

Based on the foregoing,

**IT IS ORDERED** that District must provide Student with a total of 200 hours of Special Education Services and twelve hours of Occupational Therapy as compensatory education.

**IT IS FURTHER ORDERED** that, unless both parties otherwise agree, by no later than May 2, 2016, District and Plaintiff shall develop and schedule the implementation of an appropriate, mutually-agreeable academic program that will provide Student with the awarded compensatory education.

**IT IS FINALLY ORDERED** that this case is dismissed with prejudice with each party bearing their own attorneys' fees and costs incurred herein; and the Clerk of Court shall enter judgment in favor of Plaintiff and against Defendant as to the award of additional hours consistent with this Order.

Dated this 22nd day of March, 2016.

James A. Teilborg
Senior United States District Judge